[No. G033918. Fourth Dist., Div. Three. Oct. 28, 2004.]

DAVID B., Petitioner v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in
Interest.

COUNSEL

Alyssa Saks and Donna P. Chirco for Petitioner.

No appearance for Respondent.

Benjamin P. deMayo, County Counsel and Ward Brady, Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

Law Offices of Harold LaFlamme and Linda M. O'Neil for Minor.

OPINION

**BEDSWORTH, J.**—This is a troubling case. David B. petitions for relief from an order of the juvenile court which concluded his three-year-old daughter, Susan, could not be safely released to his custody at the conclusion of the reunification period, and set the matter for a permanency planning hearing—at which time his parental rights will likely be terminated. This is always a drastic remedy, reluctantly adopted. Here we conclude it was chosen too quickly.

Although David had no contact with Susan from the time she was five months old and her mother disappeared with her, until she was a year and a half old and taken into custody by the Orange County Social Services Agency (SSA), he immediately demonstrated a commitment to her when he was notified of her plight by SSA. During his 18 months of reunification, he did virtually everything SSA requested of him, and then some. He even requested anger management classes on his own initiative, to avoid any possibility he might subject his daughter to the type of violence that had marred his own childhood. It is undisputed by everyone that he loves his daughter and has shown consistent dedication to her welfare and their reunification. However,

what David did not do is move out of the residence he shared with his sister and her husband and establish a separate residence for himself and Susan.

And what SSA did not do is tell him that such a move would be required to obtain custody. Nor did it offer David any assistance in obtaining alternative housing at any time during the final six months of the reunification period. Instead, SSA focused on minor quibbles concerning David's parenting abilities, his illiteracy, and the concern that Susan had not sufficiently "bonded" with him during his 18 months of steady visitation.

Although the trial court properly rejected some of SSA's concerns about David, it did agree with SSA's assessment that David lacked an understanding of "basic [parenting] concepts," because he asked too many questions about matters the court assumed every reasonable parent would instinctively know. It also agreed that the fact David's brother-in-law had once committed an act of domestic violence involving his own daughter meant that Susan could not be released to reside with David in that home. After David conceded he did not, at that time, have any other home to offer Susan, the court concluded it could not safely release Susan into David's custody and set the case for a permanency planning hearing.

We conclude the order cannot stand. There is no support in the record for the conclusion David lacks basic parenting abilities in any sense that would indicate danger to Susan. The fact he asked a lot of questions to ensure that his care of Susan was appropriate and to learn from the experiences of others, should be lauded, not derided. Moreover, David's responses to the questions posed to him during the hearing demonstrated a high degree of attention to and awareness of Susan's needs.

As for the concern about releasing Susan to reside in the same home as David's brother-in-law, we are not convinced that the brother-in-law's one confrontation with his own teenage daughter, more than three years ago, indicates any general tendency toward child abuse, and therefore a significant danger to Susan. Nor does the record suggest the court independently reached that conclusion. Instead, according to the court's own explanation, it apparently "deferred" to SSA's judgment on the issue. That was improper: Because SSA specifically had the burden of *proving* the contention, it was entitled to no such deference.

But even if the court had independently concluded that the brother-in-law represented a potential danger to Susan's safety, that determination would not automatically demonstrate Susan could not safely reside in the same home with him. The court should have considered less drastic alternatives, such as an order allowing Susan to reside in the home, but placing restrictions on her

interaction with the brother-in-law. With Susan expected to be in daycare during David's working hours, and both David and his sister also residing in the home, there is little reason to fear that Susan would ever have to be left alone in the care of David's brother-in-law.

Moreover, if SSA believed that Susan should not be allowed to reside in the same household as the brother-in-law, then it should have given David a clear warning that his ability to take custody of Susan might actually be contingent upon finding some *other* place to live, and it should have done so at a time when David still had sufficient opportunity to act upon the warning.

But the record here reveals no such warning, and no substantial assistance in resolving the perceived problem. Instead, it demonstrates that SSA focused its attention on lesser or even irrelevant concerns (such as the perception that Susan had not "bonded" with David), and relegated the housing issue to secondary status—something to be addressed if David ultimately measured up in the other ways it deemed important. It simply failed to focus on the one issue—housing—that is arguably determinative in this case.

Loath as we are to second-guess the trial court, there is simply no basis for this result. We consequently reverse the order and remand the case with instructions that the court reconsider its determination that David's brother-in-law presents a substantial danger to Susan's safety, applying its own independent judgment, and indulging no presumptions in favor of SSA's contentions; and if the court concludes Susan cannot be returned to David's custody at that time, issue a new order reflecting that the services provided to David during the final six-month reunification period were inadequate, and requiring SSA to offer additional reunification services. If, after the provision of such services, David is still unable to provide Susan with a suitable residence, the court may reissue the order terminating services and schedule the permanency hearing, or make any other order appropriate to the circumstances at that time.

\* \* \*

The facts of this case are essentially undisputed. David had some contact with Susan for the first five months of her life, before Susan's mother disappeared with her. After that, David was unable to locate them. In August of 2002, when Susan was two, she was taken into custody due to her mother's substance abuse and mental illness.

After Susan was taken into custody, her mother was unwilling to identify Susan's father. Susan's maternal grandmother eventually identified David as

the father, and he was contacted by SSA. At that time, David was unemployed and had no fixed residence. He was spending several days a week at his sister's home, and the rest with his then girlfriend. David reported to SSA that he had suffered from substance abuse in the past, beginning when he was 14 years of age. However, in 1996 he had entered the Phoenix House substance abuse program. Although that proved ultimately ineffective for David, he subsequently entered another facility, the Roque Center, for a 120-day inpatient program, followed up by six months in a sober-living home. He had been drug-free for 20 months when SSA first contacted him about Susan. He voluntarily submitted to drug testing several times per week prior to the dispositional hearing, and never submitted a positive test.

David did not immediately seek custody of Susan, and explained to the social worker that he felt he needed to establish a steady income, stable housing, and a relationship with Susan before assuming her care, as he was unsure of his ability to handle it. He did, however, immediately seek visitation and a chance to reunify with her. He also asked to take an anger management class, as he wanted to be sure Susan was never exposed to the violence which had marred his own childhood. According to the SSA report prepared in connection with the jurisdictional hearing, David's "service objectives" included "[s]how that you know age appropriate behavior for your child"; "[o]btain and maintain a stable and suitable residence for yourself and your child"; "[h]ave and keep a legal source of income"; "[b]e nurturing and supportive when you visit your child"; "[o]btain resources to meet the needs of your child and to provide a safe home"; "[m]aintain relationship with your child by following the conditions of the visitation plan"; "[d]evelop positive support systems with friends and family"; and "[s]tay free from illegal drugs and show your ability to live free from drug dependency." David's proposed reunification plan required counseling, an "age appropriate" parenting class, a drug/alcohol treatment program, and drug testing.

The dispositional hearing took place in December of 2002. Although the petition alleged several counts and detailed substantial facts evidencing improper behavior by Susan's mother, as well as substance abuse and mental health issues which adversely affected her ability to parent, it alleged very little as to David—only that he "knew or reasonably should have known" that Susan's mother was unable to properly care for the child due to substance abuse and mental illness. The petition was modified to strike the actual knowledge allegation, and David submitted on the allegation that he "reasonably should have known."

During his first six-month reunification period, David complied with his service plan. He enrolled in a substance abuse program, a parenting class and

an anger management class. He tested regularly for drugs, visited steadily (and in increasing amounts as SSA allowed) with Susan, and participated in 19 sessions of therapy with her, without missing a single one. He also obtained employment doing cleanup in a bakery. He consistently expressed his desire to reunify with Susan.

In connection with the six-month hearing, SSA reported to the court that David was making slow and steady progress, but needed additional work. It expressed its concerns that he had been unable to find suitable employment because of his illiteracy and an arrest record related to his past drug use, and that he had not fully utilized referrals designed to address his illiteracy. SSA also noted in its report that David was attempting to obtain a suitable residence which would allow for the presence of the child. In a separate "Case Plan Update" report, SSA described David's progress toward his objective of "obtain[ing] and maintain[ing] a suitable residence for [him]self and [Susan]" by noting that David was residing with his sister, and that while the home was physically adequate, his brother-in-law's "recent history of domestic violence . . . would make placement of the child unsuitable at this time." It does not state whether that specific concern was discussed with David, or if so, what was said. It does, however, by its clear language, suggest the home might be suitable at a future time.

The six-month hearing was held in May of 2003. At the conclusion of the hearing, the court determined that continued supervision was required and Susan could not be returned to the custody of either parent. It increased David's visitation to three hours of unmonitored visitation two times per week, and set the matter for an interim review in July and a 12-month review in September.

For the interim review in July, SSA reported that David was working seven days a week cleaning Barnes and Noble bookstores on a split shift. He had been spending increased amounts of time at his girlfriend's home and had taken Susan there for visitations. When he was told that his girlfriend's home had not been approved for visitation, he agreed not to take her there anymore. The report also noted that the instability of his living situation, splitting time between residing with his sister and his girlfriend, was the "most significant obstacle" to placing Susan with him. It did not discuss the suitability of either home as a permanent option.

In connection with the 12-month review, SSA reported that David was continuing to work at his custodial job, but had apparently terminated his relationship with the girlfriend and was now living full time with his sister and her family. The report also explained, in a separate "relative placement" section, that in August of 2003, David's sister and brother-in-law met with

the social worker to inquire about possibly placing Susan in their home. The report then merely notes "[The brother-in-law] was not able to be cleared due to arrests within the past 3 years." It does not state that David was present during the meeting or was informed about SSA's conclusion.

SSA's report also notes, in a later section, that David "believes that housing remains his main obstacle to reunification with the child" and that "he has considered a number of possible housing options for himself and the child." In the "service objectives" portion of the report, it notes that David "continues to struggle with acquiring adequate housing for himself and his child" and "continues to strive for adequate financial and housing resources." The report then notes that "[o]n August 14, 2003, the [social worker] provided an extensive listing of housing resources in Orange County to the child's father to assist with locating housing." The social worker later acknowledged he did not review the referrals orally with David, despite the fact he knew David to be illiterate. Instead, he relied upon David's statement that his sister would read them to him.

SSA's report reflects that its own primary concern was not David's housing situation, but instead its worries about his ability to be "nurturing and supportive" with Susan. SSA identified that as "the area which is currently of greatest concern for [David]." The report did not actually describe any problems with David's conduct, but only with Susan's perceived lack of attachment to him: "The child has demonstrated a clear and observable reluctance to participate in visitation with the father. The caretaker has reported that the child's actions prior to visitation have alternated between refusal to go and happiness. This area remains an area of growth and improvement for [David]." The report then stated David was to receive "in-home parenting assistance specifically focused on working on attachment and bonding, facilitating positive parent-child interactions." The social worker later explained that he had gone to extreme lengths to arrange the in-home parenting assistance—as he put it "I had to plead a little"—because it was generally not offered until after a child is placed in the parent's home.

The 12-month hearing took place in September of 2003. The court concluded continued supervision was necessary, that there was a substantial probability Susan would be returned to the custody of her parent within the next six months. It ordered additional reunification services. The 18-month review hearing was scheduled for February of 2004.

SSA's report for the 18-month review describes David's progress, noting he was "generally compliant with the Court ordered case plan," but had not successfully complied with it "in that he has not acquired adequate resources to provide [for] himself and the child." It explains that "[t]o his credit,

[David's] parenting skills have improved during the course of the current dependency action. Furthermore, [David] has demonstrated a consistent commitment to reunification efforts on behalf of his daughter. However, while [David's] parenting skills have improved, [he] has not successfully demonstrated a successful ability to provide daily, around-the-clock care for the child." The report went on to explain that David had left his custodial job after his hours were cut. He subsequently worked a temporary job in a warehouse for a couple of months and was seeking additional employment. The report stated that David had been dropped from his in-home parenting program after he missed two of the nine sessions due to work conflicts.

The report additionally explained David had progressed to 12 hours of unmonitored visitation per week, and had asked for an overnight visit on Christmas Eve. In connection with that request, on December 21, 2003, the social worker conducted a scheduled home visit to the residence David shared with his sister and her family. The social worker concluded the home was deficient for an overnight visit in several respects, including a lack of basic supplies, such as a crib or high chair; accessible containers of makeup in the room belonging to David's teenage niece; the presence of some cleaning supplies under a sink; and a lack of child safety devices preventing access to dangerous items. David was refused permission for the visit.

The report also reflected SSA's thoughts on placing Susan with a relative. In addition to reiterating that David's sister and brother-in-law had inquired, it also stated that a maternal aunt by marriage had been enjoying unmonitored visitation with Susan since January of 2004. The aunt had expressed an interest in adopting Susan and was considered "an active placement consideration." According to the report, David had expressed concerns about this aunt's adoption of Susan, but at one point indicated "a willingness" to allow the adoption as long as he would be allowed to maintain contact.

Finally, the report stated its assessment of David: "To his credit, the child's father has progressed slowly and steadily in his ability to care for and nurture the child. The child's father has demonstrated a consistent commitment and dedication to reunification efforts with his daughter. The father's progress is noteworthy; however, [he] has not demonstrated the ability to provide for the ongoing emotional or physical needs of the child. While [David] is aware of his need for improved literacy and job skills, he has not taken any observable steps to improve the likelihood of obtaining adequate resources for himself and his daughter. [David] has been sporadically employed throughout the life of this case. [He] indicates that he is living with his sister in Westminster, California." Based upon all of that information, SSA concluded David was not in a position to have Susan placed with him, and recommended termination of reunification services.

Other than the social worker's visit to assess David's residence (which he continued to share with his sister and her family) for overnight visitation, the 18-month report did not reflect any effort to address the issue of David's housing situation during the six-month reporting period. Instead, it merely reiterated the fact that David had been given a list of housing resources back in August of 2003.

The 18-month hearing commenced in February of 2004. The social worker who prepared SSA's reports testified. He stated he had been assigned to the case in September of 2002, essentially at its inception. He acknowledged that David had complied in nearly every respect with his reunification plan, and agreed that David had demonstrated an unfailing commitment to Susan and was "making steady progress" in his parenting abilities.

When asked about David's residence, the social worker first stated he was not even clear where it was. "The father has reported that he is living with his sister. I have some conflicting information about that. So I don't—to be honest with you, I don't know that I have a solid answer about where he is staying." When asked if he had ever visited the sister's residence, the social worker described his inspection of the premises after David had requested permission for Susan to have overnight visitation with him. Although the social worker denied permission for the overnight visitation, for the reasons stated in his report—lack of safety equipment and basic gear necessary for the care of a toddler—he nonetheless continued to allow Susan to visit the home for 12-hour unmonitored visits.

The social worker stated he did discuss with David the reasons why he concluded the residence was physically inappropriate for Susan to visit overnight, but he never followed up to determine whether David had cured the problems identified. As he explained, "I was never asked—the father never said that he had taken care of them. I did understand from a recent contact with the father that he had been advised to get those things in preparation for the return of the child. But I never heard anyone tell me that those concerns had been addressed."

The social worker also stated he had concerns about the sister's residence because of her husband's history of arrests for alcohol-related offenses as recently as 2001, and one incident of physical violence involving a child in 2001. He acknowledged that he had no facts about any of the incidents, however, and conceded it "would be helpful" to have that information. He also acknowledged he had been provided with documentation demonstrating that the husband had completed a six-month alcohol treatment program. Nonetheless, the social worker stated his opinion that the husband's past history was of sufficient concern that Susan should not be released into the same home where he resided.

The social worker also stated he considered David's ability to adequately parent Susan to be "an unanswered question," and said he had not been able to assess the issue sufficiently because of the limited, and unmonitored, visitation David had enjoyed. As he explained: "I have not said that he doesn't have the ability. What I'm saying is we have not been able to assess—we have not had the opportunity to assess his ability to parent the child." When asked about his concern that David tended to call the foster parents and seek guidance whenever a problem arose, the social worker acknowledged that "[i]t's not a regular thing" and agreed that "[s]eeking advice is always a positive thing."

David also testified. He described his experience in parenting class, explaining that the class taught parents about the different stages of child-hood. Unfortunately, the class to which he was referred covered only five year olds through teenagers, which was not immediately relevant to the father of a two year old. So he "took the teacher aside and asked her, 'Okay, I've got . . . a two-year old. What should I do?' " She advised him to "listen to the child, and watch what she does and watch every movement she does. And pick up what she's doing a learn from it." He also learned "to be there for [Susan], and love her and try to teach her what I know to the best of my knowledge."

He described his visits with Susan, stating "we play with toys. I take her places, take her to the park. I just try to be the best father I can for what I know." David stated that he changed Susan's diapers several times during each 12-hour visit. When asked what foods he feeds her during visits, he replied "apples, bananas, french fries, . . . milk, . . . chicken, potatoes, her vegetables." He explained that Susan had teeth and could chew things well, and was then learning to feed herself with a baby fork. He also noted that when she was younger, Susan had a tendency to "shov[e] food in her mouth," so they had to teach her to eat slowly, and take smaller bites.

David also stated that if he were given custody of Susan, he could transport her to places she needed to be either by bus or in his sister's car. He stated that he had a license, his sister's car was insured, and he had a car seat for Susan. Additionally, David explained that after the social worker visited his home to assess it for an overnight, he made all the changes requested: "I got the plug safety put in the plugs. I got the—it's like a high [c]hair, but a booster chair with a highchair tray on it to sit on the chair. I got an—it's not a crib, but it's a toddler bed with the rails on the side of it for her. I got new sheets for her. . . . We bought locks for the cupboard doors. We did that. And basically we did everything he told us to do."

David acknowledged he had established no plans for Susan's medical care, because he had no family doctor and no insurance. He stated that he had

asked the foster mother about Susan's medical care, and was told she "has services from the county." He assumed that if he needed help, he could call Susan's foster mother, or ask his sister. Otherwise, he had not given it much thought, "because she wasn't in my care 24-7."

David was asked where he would "buy the supplies" he needed for Susan, David replied: "I buy diapers at Walmart. I buy food at the grocery store. I feed her the same food that I would eat. [¶] . . . [¶] Because she's at the age where she don't need baby food or anything. I would buy—I got sippy cups for her. I'm teaching her how to drink out of a regular cup. And I am on the verge of trying to potty-train her."

When asked if he knew what her "teething situation" was, David responded: "Right now she has her back molars. [¶] . . . [¶] There—on Sunday they were bothering her. [¶] . . . [¶] And I usually keep Tylenol. But I couldn't find the Tylenol. So I called the foster parent, and she—. . . [¶] . . . I called the foster parent Linda and they said if she is not running a high fever, it's not—they usually [just] watch her closely." David went on to explain that after talking to the foster mother, he did not give Susan any Tylenol, but just "checked her—had her open her mouth, and I touched it to make sure it wasn't hurting her and it wasn't. I was doing the things that basically what I know." David then said that if he needed to take Susan to a dentist, he would go to the one his sister uses.

David stated that his current employment was working for a roofer, but because of the slow winter season, he had also been working for temporary agencies. He explained that his hours as a roofer were generally from seven in the morning to five in the evening, and that he usually had weekends off. He had arranged for Susan to have child care during his work hours from his aunt, whom he described as having been previously "approved because she used to take care of my cousins." This aunt lives about a half-mile from David's residence, and he explained that either the aunt would pick Susan up, or David and his sister would transport her there.

David was then asked a hypothetical question about what he would do if Susan suddenly developed a fever while in his care. He responded: "It depends how high it was. Say 103, I would take her to the emergency room. [¶] . . . [¶] And get a—get the doctor's opinion what I should do." When asked what emergency room he would go to, he replied "probably Huntington Beach Hospital."

David was also asked about his brother-in-law. He stated that he had known him about 20 years, since he and David's sister were in the ninth grade. David stated that he did not know any of the details of his brother-in-law's record, and considered it not his business. When asked whether he

should be concerned about the people who might be living with his child, David responded "Since you brought that up, I know my brother-in-law and he is not a violent person. [¶] . . . [¶] When he is around my daughter, my daughter loves him. I mean, she really loves him. And he is really good with my daughter, good with his kids."

At that point in the hearing, the court adjourned for the day. The following day, the court suspended the hearing pursuant to a stipulated order that Susan would begin one-night-per-weekend overnight visits with David as soon as SSA could approve the home. After four weeks of one-night-per-weekend visits, the schedule would be increased to two nights per week until the hearing reconvened in April. Additionally, SSA was to reinstitute in-home parenting services for David, and apply for a waiver to allow Susan to be in the same home as David's brother-in-law and report to the court about the result of the application as well as the circumstances of the brother-in-law's record. The court specified that pending receipt of the waiver, the brother-in-law's status would not be a bar to the overnight visits.

Toward the end of the two-month break, SSA reported to the court that its recommendation was unchanged. The report stated that the social worker had made a visit to David's home in March, and had observed that he had made all the changes previously requested and as testified to by David in the earlier part of the hearing. Nonetheless, the social worker noted additional problems, including a stained carpet, pet odor, and debris in the back and side yard which made them unsuitable for a child's play area. He requested additional changes, and when he returned a few days later, those changes had also been made.

Susan began one night per week overnight visits on March 13. In early April, the foster mother reported that Susan seemed "exhausted" and "out of sorts" after overnight visits with David. Nonetheless, the overnights progressed to a two-night extended stay on Easter weekend, April 9, 2004. The social worker made an unannounced visit to witness Susan's transfer from the foster parent to David on that Easter weekend.

During that transition, Susan was heard to say "No more Daddy." The social worker asked David if he had a driver's license and David said "I think so." However, when the social worker examined it, it proved to be expired, to David's apparent surprise. The social worker further observed that David was driving a vehicle with what he considered to be "obviously deficient . . . tread in the middle third of the tire[s]." The social worker then told David not to drive Susan around during the upcoming weekend, but then released them to go on their way. When David returned Susan at the end of the weekend, the social worker was once again present. David's sister was driving the car.

Susan was reported to be sleepy, but in good condition, with only a "somewhat sunburned" face. David explained that Susan had been given sunscreen, but had spent a great deal of time playing outside with other relatives during the Easter holiday.

The report also noted that SSA had received a letter from the brother-in-law on April 12, explaining the circumstances of his domestic violence incident. The letter explained that in May of 2001, the spouses had an argument which included pushing. He was arrested for domestic violence and willful cruelty to a child. He pleaded guilty to the domestic violence and served 90 days in jail. The child cruelty charge was dropped. He completed a 52-week anger management/domestic violence class, and a 34-week alcohol/drug intervention course. He was also separated from his family for 12 weeks due to a mandatory restraining order put into place while his wife completed a "women's empowerment class."

An arrest report concerning the domestic violence charge added more detail to the alleged incident. The brother-in-law was described as "very intoxicated." His daughter, then age 14, was interviewed. She stated that she had returned home at 11:15 in the evening and was confronted by her father. They argued and he squeezed her arm. When she pulled away, he grabbed both arms. She again pulled away and told him to leave her alone. He attempted to pick her up and put her over his shoulder. She began hitting him in the face and tried to get away. He wrestled her to the ground and grabbed her around the throat with both hands, choking her. After several seconds, he let her go and went inside the house. His wife was interviewed and stated that he had been drinking alcohol all day and was very drunk. They were arguing and he started pushing her around. He yelled at her and pushed her out the door. When she tried to come back inside, he pushed her in the chest, causing her to fall down. He then locked the door and would not let her inside.

Although the brother-in-law's criminal record confirms his statement that the child cruelty charge made against him was dropped, the Child Abuse Registry does include a substantiated child abuse report based upon the incident, and the family received "voluntary Family Maintenance, Non Court services."

Otherwise, the brother-in-law's record included one count of possession of a controlled substance for sale in 1992, two arrests for alcohol-related conduct in 1995 and 2002, and a conviction for intoxication, disorderly conduct and misdemeanor assault in 1999. Based upon that record, SSA refused to approve a waiver allowing Susan to reside in the same home with the brother-in-law.

The report also noted the social worker had made an unscheduled visit to David's residence on April 18, 2004. He and Susan had been resting, and David reported having a headache which he attributed to the after-effects of a car accident he had suffered 10 years before. The social worker observed David and Susan for an hour, but noted that Susan spent most of the hour interacting with him rather than David. David was observed disciplining Susan, and explained she "does stuff just to aggravate me." When he disciplined Susan, David would sit her on the couch and "speak in a firm tone." But David was also observed "tickling [Susan] playful[ly]," and he stated that he enjoyed having Susan with him and that they had been having a good time.

Finally, the report stated that David had received five weeks of in-home parenting services, although they had taken place at a time when Susan was not present, and thus "offer very little insight into the parenting skills and ability of [David] [as had been anticipated and desired.]" SSA had received a report from someone identified as a "Child Abuse Prevention Center in-home parenting aide," who visited with David on two occasions over a five-day period. She stated David had expressed reluctance to take Susan to public places, because she "doesn't sit still." The aide also noted that she had given David some referrals to assist him in obtaining better employment, but felt he was moving very slowly in following up. The aide was concerned about David's lack of progress.

In its final assessment of David, SSA stated: "The expanded visitation with the child's father is reported by the father to be a positive experience for him. However, the child's reaction has been less positive and of increasing concern to the undersigned. [¶] . . . [¶] During the course of this supervision, the undersigned has repeatedly observed the child's father to express a consistent desire to reunify with the child and to strive toward that end. However, the child's father has also struggled with his ability to overcome his own difficult childhood experiences and his lack of experience as a parent, to develop the ability to provide basic nurturing and care for the child. It is clear to the undersigned that the child's father loves his daughter very much. However, it is both the observation and the opinion of the undersigned *after more than twenty months of services and increasing visitation between the child and the father, the child appears to be tolerating contact with her father.* [¶] . . . [¶] The father is to be commended for his efforts. There is no question that he has worked long and hard to reunify with the child. Nonetheless, *the child's father does not appear to be capable of making sound decisions or of establishing the nurturing and loving relationship so vital during a child's early development.* Additionally, the child's father is unable to adequately provide for the child's basic needs and is completely dependent upon the generosity of the paternal aunt for housing and other resources." (Italics added.)

When the hearing recommenced on April 26, 2004, the social worker once again took the stand to explain SSA's conclusion that Susan could not be safely placed in David's custody. The first concern he articulated was the perception that Susan had not bonded to David. He stated that in his opinion, the lack of a bond put Susan at risk because "lack of attachment and . . . reciprocal connectedness could be an indicator and precursor [of] . . . physical abuse, emotional abuse, sexual abuse, you name it."

The social worker then acknowledged that while David had actually demonstrated an ability to handle his anger, and thus it was not an issue "in the short term, immediate future," he nonetheless believed the issue "is definitely on the horizon."

The social worker also stated that he did not believe David could provide round-the-clock care for Susan without assistance, based upon the numerous questions he asked about basic issues during the periods Susan was in his care. He explained, "it's not so much that he is seeking help, it's the kind of help, the basic fundamental stuff that parents—that we would expect someone to grasp, at this point, after parenting and after all this time interacting with the child—what to do for naps, what to do for food, what to do to interact with the child, how to discipline the child without scaring the child, how to—all those things that I don't see happening in this case without a lot of support." The social worker was also concerned that David failed to recognize potential dangers, such as Susan's access to dangerous chemicals, or debris in the yard, until specifically advised by someone else. In the social worker's opinion, David simply needed too much guidance, and had demonstrated "a pattern of either poor judgment or lack of judgment."

The social worker also stated that SSA would not sign a waiver to allow Susan to reside in the home with David's brother-in-law, due to his domestic violence and criminal history. He explained he had concerns about the cleanliness of the home, although he acknowledged that the home was at that point in an acceptable state. He nonetheless was concerned that it could "easily return" to being "unfit."

When asked if he had spoken to David about living someplace else with Susan, the social worker referenced only the conversation he had with David back in August of 2003: "Not recently, but we have explored that, previously, and I gave him every housing resource that I have in Orange County. And we talked about—*this was several months ago now*. We have explored those options, and nothing has ever come of them that I'm aware of." (Italics added.)

The social worker never ran through hypothetical scenarios with David to assess his ability to handle difficult situations with Susan. He made no effort

to do so until one week prior to the continuation of the 18-month hearing, but David called to inform him he could not make the scheduled meeting. David stated he would attempt to make up the meeting the next day, but was unable to do so.

When the court asked the social worker whether he had ever spoken with David about whether he would be able to arrange child care and other aspects of Susan's care if he got a place of his own, the social worker replied: "We have talked about child care, briefly, and—but we have never even gotten that far. So I don't believe so, but I don't know."

At the resumed hearing, David testified he had obtained a 90-day extension on his driver's license, and that if he were unsuccessful in passing the test for a renewal, he would make arrangements for Susan's transportation with others or through public transportation. He testified that he had family support to assist him in his care of Susan; in addition to his sister and brother-in-law, he mentioned his aunt, uncle, grandmother, and a cousin and her husband.

He also testified that he did not believe his brother-in-law to be any danger to Susan, but if he were told that he could not leave Susan alone with him, he would follow that rule. He agreed that exposure to domestic violence would be harmful to Susan, and stated that if any future incidence of such violence were to occur in his sister's home, he would find another place for himself and Susan to live. David explained that he had grown up in an abusive household, with a "very violent" father, and stated "from the way I was raised, I will not ever hit my child."

He denied having contacted Susan's foster mother for advice as much as the social worker testified, but acknowledged that he had done so on several occasions, because "she knows my daughter better than I do." He also explained how he had learned from the foster mother's answers, and gave examples of how he applied the strategies she suggested when similar problems arose on later occasions.

David explained that he had begun looking into alternative housing arrangements, but had identified only a program which required him to have a full-time job. If he were given custody of Susan, he also intended to apply for aid from the WIC (Women, Infants, and Children) program, but explained that he could not do so until he had documentation such as Susan's medical records and birth certificate. He acknowledged that if he were not living with his sister and her husband, he could not support Susan "right now." The court asked him "if I was inclined to return the child to you today and told you you couldn't live with your sister and brother-in-law, you would kind of be at a loss; right?" He agreed: "Think so, yeah."

The court then issued an order terminating reunification services and scheduling the case for permanency planning hearing. It explained: "Father has done 18 months of services. Father has done basically everything the court has asked father to do, with one exception. And that is, father has not prepared himself for the return of this child. And because father has not done that, the court finds that there is continued risk to the child. [¶] Father has not gotten himself a job. Father has not—has not gotten himself an apartment to take care of this child. Father has not looked into medical care for this child. Father has not looked into medical insurance for this child. Father has not prepared himself for the child physically being returned to father. [¶] Father argues through his counsel that the court should return [the child] to father because father was [living] with the sister and brother-in-law, and that they can help father take care of this child. They went to social services and were not able to obtain a waiver. . . . [¶] *If the court thought for a minute that social services was abusing its discretion, the court would [disregard social services recommendation]. However, the court believes that social services has legitimate reasons for not placing this child.* [¶] The report indicates that this home has many needs and those needs are such that it would place the child at risk if those needs were not met. . . . *That's the physical needs of the home.* [¶] Social services also has concerns that *the sister and* brother-in-law have unresolved drug and alcohol and domestic violence problems. . . . [¶] . . . The report indicates that the last incident was about 18 months ago. However, the court has heard *no evidence in this matter that those problems have been resolved.* . . . This court would not order the child placed at that residence."

The court also gave a second reason for denying custody to David: "The court has no question that the father loves this child. The court has no question that Father had a good time with this child on the visits. [¶] The court has great concern, from the evidence, that father does not understand the very basic needs of this child. While the child is on visitation with father, the father calls the social worker and foster parents to get information on things that would seem to the court to be instinctive in raising a child, to be very basic in raising a child. [¶] The child doesn't like peas. So you give the child carrots. You don't need to call the social worker or the foster parents to know that. That's just something a parent knows. [¶] Father says the child won't sit still. It's a two-year old. Two-year olds never sit still. You follow a two-year old around, keeping them from falling down. That's what you do as a parent. [¶] And father doesn't understand those very basic concepts." Based upon these concerns, the court concluded Susan could not be released to David's custody.

David filed a petition for extraordinary relief with this court, arguing primarily that there was insufficient evidence to support the court's conclusion that placing Susan in David's custody would create a substantial risk of detriment to her safety and well-being.

After our own review of the record, we requested the parties provide additional briefing addressing the following issues: (1) whether SSA ever informed David that it had deemed the residence he shared with his sister and brother-in-law to be inadequate for Susan to reside in; (2) whether SSA offered or provided David with reasonable services to address what it perceived to be his lack of an adequate residence; (3) whether the court actually placed the burden on SSA to prove that releasing Susan to David's custody at the residence he shared with his sister and brother-in-law would create a substantial risk to her safety and well-being; and (4) whether the court abused its discretion in refusing to place Susan in David's home with reasonable restrictions and/or monitoring designed to mitigate any perceived danger from David's brother-in-law.

I

■ Initially, we note the trial court correctly disregarded SSA's assertions regarding David's illiteracy and Susan's purported lack of a significant bond with him. As the court explained, a parent's ability to read has no demonstrated correlation to his or her parenting skills or dedication.

■ As for the issue of whether Susan felt bonded to David, this is simply not the relevant inquiry at this juncture. Until services are terminated, reunification is the goal and David is entitled to every presumption in favor of having Susan released to his custody. "Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' [Citation.]" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200].)

■ The preference for maintaining family relationships does not depend upon David's ability to make Susan feel bonded to him, especially when he has never had the opportunity to parent her on a day-to-day basis. The issue at this point is whether placing Susan in her father's care represents some danger to her physical or emotional well-being. The existence of a parental bond takes on independent significance only after the reunification effort is terminated and the case is sent to the permanency planning stage. In that context, the strength of a parent-child bond is significant, because a strong

enough bond may be sufficient to overcome the statutory preference for adoption over other permanent placement options. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(A).)

## II

■ But we are not there yet. At this point in the proceedings, the burden is entirely on SSA, not David. As the Supreme Court explained in *In re Marilyn H.* (1993) 5 Cal.4th 295, 308 [19 Cal.Rptr.2d 544, 851 P.2d 826], "At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody. . . . At 6-, 12-, and 18-month review hearings the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being." (See also *In re Jasmon O.* (1994) 8 Cal.4th 398, 420 [33 Cal.Rptr.2d 85, 878 P.2d 1297].) Consequently, review hearings represent one of the "[s]ignificant safeguards . . . built into the current dependency scheme." (*In re Marilyn H., supra,* 5 Cal.4th at p. 307.)

■ What SSA was required to establish was that releasing Susan to David's custody would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code, § 366.22, subd. (a).) That standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.

We do not get ideal parents in the dependency system. But the fact of the matter is that we do not get ideal parents anywhere. Even Ozzie and Harriet weren't really Ozzie and Harriet. Ideal parents are a rare—if not imaginary— breed. Some of us get luckier than others when it comes to parents, and most who work in this system are able to look back and realize how fortunate they were. But the State of California is not in the business of evaluating parents and redistributing their offspring based upon perceived merit.

The parents who come through the dependency system are more in need of help than most. If we are lucky, they are parents who can learn to overcome the problems which landed their children in the system, and who can demonstrate the dedication and ability to provide for their children's needs in an appropriate manner. They will not turn into superstars, and they will not win the lottery and move into a beachfront condo two blocks from a perfect school.

This is a hard fact to accept. We are dealing, after all, with children, and the dedicated people who work so hard to help these families are understandably desirous of providing those children with the best possible circumstances in which to grow up. But there are times when we have to take a step back and make sure that we are not losing sight of our mandate. We are looking for passing grades here, not straight A's.

In this case, the court concluded that Susan would be at risk in David's custody based in large part on the fact that David consulted frequently with both the foster mother and the social worker during the times he was caring for Susan, thus demonstrating his own inability to deal with the everyday issues of parenting. But the example given by the court (i.e., "[t]he child doesn't like peas. So you give the child carrots. You don't need to call the social worker for the foster parents to know that. That's just something a parent knows") indicates the court was focused on details, rather than the essential question of whether Susan's safety, protection, physical or emotional well-being would be placed at substantial risk in David's care.

■ When we are considering whether to deprive a parent of custody, we are concerned only about his or her grasp of the important parenting concepts—things such as a child's need for security, adequate nutrition and shelter, freedom from violence, proper sanitation, healthcare, and education. Whether a child's preference for carrots over peas should be indulged is not a significant issue, and certainly not one that should ever play into a custody determination.[1]

The other issues mentioned by the court, i.e., David's mentioning that Susan "won't sit still" and "does things to aggravate him" are likewise insignificant. We cannot think of any parent (or caretaker) of a two year old who would not complain about those things. There is a reason the age is called "the terrible twos." The more salient issue is whether David reacts inappropriately to Susan's behavior, and there is no evidence he ever did.

Further, we are seriously disturbed by any suggestion that David's tendency to ask for assistance in caring for Susan should be counted against him. He is a new father, inexperienced in dealing with a small child, and apparently far more afraid of making a mistake than of appearing stupid. And to that we say hallelujah. There are no new parents who have all the answers, and it is David's willingness to seek assistance when he is unsure of himself that perhaps best demonstrates his parental fitness.

---

[1] Moreover, despite the trial court's expressed certainty, reasonable minds can differ, and have, over whether a child's finicky eating habits should be accommodated or resisted. In other words, "every parent" does not "know" the same answer to that problem.

In fact, the types of questions David posed, about how to deal with Susan when she acted out, what sorts of foods she preferred, and whether she should be given Tylenol for teething pain, frankly demonstrate an appropriate concern about significant issues. And David's explanation for turning to Susan's foster mother makes perfect sense: "She knows my daughter better than I do . . . and she gave me right things to do." David has not had custody of his child since her birth, and consequently this comment shows admirable insight into the limitations of their relationship.

Of course, asking for assistance could evidence a problem if the types of questions posed revealed a troubling mindset. For example, we would certainly agree there was a problem if the record indicated David had queried: "What is the proper progression of discipline—do I hold Susan's hand over an open flame only after a 'time-out' has proved unsuccessful?" Or if he had wondered: "Which is better to calm her down, bourbon or gin?" But David asked no such questions.

We might also agree there was a problem if the parent's questions simply revealed an intractable unwillingness to provide appropriate care: "Can you tell me why I have to keep changing the diaper when she is just going to dirty it again?" Or "If I don't need a car seat, why should she?" Indeed, as we have indicated, most troubling might be if David asked no questions at all. But David acknowledged his ignorance, and his questions invariably revealed a desire to provide better care, not lesser care.

Significantly, although the burden of proof was on SSA, even the social worker acknowledged he could not say David lacked sufficient parenting skills at the beginning of the 18-month hearing. He flatly stated "we haven't completed that assessment. [¶] I don't think I can answer that . . . ." The only thing that changed between that point and the conclusion of the hearing is a two-month break during which David was allowed overnight visits with Susan. Those went well, with the only problem reported being that Susan was tired and somewhat out of sorts afterward. Of course, the disruption in her routine would be more than sufficient to account for that result, and it is difficult to see how it could be said to evidence a lack of parenting skills on David's part.[2]

---

[2] Granted, there was one incident during the two-month break which did demonstrate poor judgment on David's part. It was the fact that he arrived to pick up Susan for an overnight visit in a car with insufficient tire tread and at a time when his driver's license had expired. But it is not clear how that incident reflected on David's parenting skills specifically. Driving with an expired license is illegal, no question, and we certainly do not condone it. However, it is not necessarily unsafe. There was no evidence David was not a competent driver. And the problems involved in judging parental adequacy by automobile maintenance seem to require little discussion. In any event, we could not conclude the tire tread presented a significant danger, because the social worker acknowledged that after he discovered the problem, he

The social worker did explain that he had hoped the in-home service provider who worked with David during the two-month break would be able to add some insight on the issue of David's parenting skills, but acknowledged that had not worked out, since the services were offered at a time when Susan was not actually present (hardly David's fault). Thus, it appears there was no additional evidence developed in the gap between the first and second parts of the hearing which would justify a downgrade of David's parenting skills from "unknown" to insufficient. We consequently conclude SSA failed to sustain its burden on that contention.

In short, SSA found flaws. It did not find anything which would overcome the presumption in favor of reunification by indicating Susan's return would create a substantial risk of detriment to her physical or emotional well-being.

### III

The court's other basis for denying David custody was that he was simply unprepared to take over Susan's custody. The court mentioned several things, including that David had not arranged for Susan's medical care or for insurance. We note that many lower-income parents cannot afford insurance and may not have regular relationships with private physicians. We cannot agree that would preclude them from retaining custody of their children. What is far more significant is that David did have a plan for how he would handle any significant and unexpected medical problems Susan might have— i.e., the hospital emergency room—and that once David had custody of Susan, it would be a small matter to identify a local clinic where she could receive more routine care. Since there was no indication Susan needed to see a physician imminently, it seems unduly harsh to penalize David for—in effect—not having already scheduled her next checkup.

The court was also concerned that David had not gotten himself a steady job. We agree that a parent needs to have adequate resources to provide for his child, but again we must point out that the bar cannot be set too high. We cannot separate parents and their children merely because they are poor. There was no evidence David was unwilling to work, and indeed the record reflects he worked fairly steadily, albeit at several different jobs, throughout the pendency of this case.

---

nonetheless allowed David to take Susan with him. As he explained "It was Easter weekend, and I didn't—I just couldn't bring myself to not allow him to have his visit for that weekend. [¶] I did instruct him very clearly that he was not to be driving the child beyond the return trip home. And so when I showed up again, unannounced, on the following Sunday, April 11, he wasn't driving."

What we find significant about David's job history is that he has found and maintained work even while maintaining a regular visitation schedule, attending classes, making testing appointments, and meeting with social workers. The record also reflected that David had substantial family support, not the least of which came from his sister and her husband. There was evidence that David did have sufficient resources to provide for Susan as long as they were permitted to remain in his sister's home.

## IV

Which brings us to perhaps the crux of this case. It was clear from the evidence that David did make preparations to have Susan returned to his custody—in the home he shared with his sister and her family. He had baby-proofed it and obtained a bed, a booster seat, and the other supplies needed for a toddler. In fact, he did everything the social worker asked of him—to prepare *that* home for Susan. And contrary to the court's statement, there was no evidence the home itself was physically insufficient. The social worker merely stated that "while it's in order at this time, I believe it could easily return [to an unclean state.]"[3]

In fact, the record reflects that the only real problem with placing Susan in David's current home was his brother-in-law's troubled history. And while the record also reflects SSA had reached the conclusion it would oppose such a placement fairly early in the case—at least as early as August of 2003, which was prior to the 12-month hearing—there is no evidence that David was ever informed of that specific concern. Instead, the record states that the social worker merely gave David some generic advice concerning the need for housing, along with a list of referrals, *also prior to the 12-month hearing*, and then never discussed the issue with him again. That was insufficient as a matter of law.

Of course, we recognize that "[r]eunification services need not be perfect. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 [78 Cal.Rptr.2d 311].) But they should be tailored to the specific needs of the particular family. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 810 [41

---

[3] Likewise, the court was mistaken in implying that David's sister might have a history that presented an obstacle to the placement. To the contrary, the social worker expressly agreed that it was fine for Susan to be around her, and made clear that the perceived problem was caused solely by her husband. And the court was also incorrect in stating there was no evidence that the husband's problems had been addressed. The evidence actually showed he had completed substantial domestic violence training, as well as a lengthy substance abuse program. The family had also received family maintenance services. Both the wife and the daughter whom he was accused of abusing were still living in the home with him, without apparent further incident. Why are we requiring people to attend these classes and programs if we don't believe that *sometimes* they work?

Cal.Rptr.2d 731].)" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972 [134 Cal.Rptr.2d 210].) As this court has previously explained, "to make the requisite findings, the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 [286 Cal.Rptr. 592], italics omitted.)

In response to our inquiry concerning the adequacy of services provided by SSA to address its concerns about David's housing situation, SSA requested that we: (1) consider a declaration from the social worker as a supplement to the evidence admitted at trial; (2) recognize that it would be unduly burdensome for SSA to document all of the services it provides; and (3) join the trial court in *assuming* that "certain non-statutory, but routine conversations and advisements . . . have been given." SSA then assured us that "the juvenile court *had no reason not to believe that reasonable efforts had been exercised* to timely advise [David] of the things he needed to do to effect Susan's return."

■ However, that assurance sounds suspiciously like an implicit assertion that the juvenile court was entitled to assume the services were reasonable, unless someone proved otherwise. That is not the standard. Instead, the law "requires 'clear and convincing evidence' that such services have been offered to the parents. Under this burden of proof, 'evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' [Citation.]" (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306 [36 Cal.Rptr.2d 910].)

■ Moreover, neither we nor the juvenile court can rely upon factual assumptions—gleaned from SSA's "regular supervisorial practices" to establish clear and convincing evidence. SSA is not a machine; it is a team which includes numerous individual caseworkers—each of whom is expected to give individual attention to the needs of each case. The fact that most social workers do things a certain way does not establish clear and convincing evidence that even those social workers *always* act that way—let alone that another social worker necessarily did so in connection with the case at issue. If SSA wishes the court to consider certain actions of the social worker as evidence in a particular case, then SSA must introduce *evidence* that those actions took place in that case. The court cannot merely assume it.

■ Of course, we are mindful of the basic requirement that we indulge all inferences in favor of the factual conclusions reached by the trial court.

(*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547 [247 Cal.Rptr. 784].) But those conclusions must be based upon substantial *evidence* which appears in the record, not upon the court's own unarticulated assumptions.[4] Here, there was no evidence which would have allowed the court to conclude SSA had provided David with sufficient assistance to reasonably address its concerns about his housing. The social worker himself testified at the 18-month hearing that he had last discussed the issue with David prior to the 12-month hearing, when he gave David a list of housing referrals. He conceded that he never followed up to see what David had done with them.

The only time the social worker paid attention to David's housing during the final six months of reunification was in December of 2003. The social worker responded to David's request to have overnight visits with Susan in the residence, but focused solely on the physical problems that then existed in the home, and apparently gave no indication he considered the residence unsuitable for other reasons. He never even paid attention to the fact that David was correcting the problems he had identified, and was thus perhaps unaware that David was proceeding with preparations for Susan to live there. Indeed, at the commencement of the 18-month hearing, the social worker indicated he wasn't even sure if David was residing there.

What the social worker was paying attention to instead was his perception that Susan was not "bonding" to David. Although he admitted he was not a bonding expert, he nonetheless explained that in his view, such a bond is "essential" for a child of Susan's age, because a "lack of attachment and bonding and appropriate attachment or reciprocal connectedness could be an indicator and precursor to . . . physical abuse, emotional abuse, sexual abuse, you name it." Given that opinion, we can see why he went to extraordinary lengths to address that particular concern, including "pleading" for in-home services to assist in fostering the bonding process. That was admirable.

But however well meaning, the social worker ended up focusing on the wrong thing. The problem in this case was housing, and it was made short shrift of. David did everything else asked of him to obtain custody of Susan, and there is frankly no reason to presume that if he had been told living with his sister was not an option, he would not have done something about that too. We recognize, of course, that the trial court asked David if he would be

---

[4] Frankly, the assertion that the juvenile court can draw assumptions about SSA's conduct based upon its own familiarity with SSA's conduct in other cases, sounds like an implicit contention that the court can act as its own expert witness. But of course, even if that were true, the court would still be required, as all expert witnesses are, to state its opinions on the record, and provide a sufficient foundation for them. Alternatively, SSA might be suggesting the court could be taking *judicial notice* of SSA's usual and ordinary practices. However, "[j]udicial notice may not be taken of any matter unless authorized or required by law." (Evid. Code, § 450.) There is no provision for taking judicial notice of SSA's usual practices.

able to support Susan "right now" if he were not living with his sister, and he conceded he could not. But that in no way demonstrates he could not have made arrangements to do so *over time*, if he had only been told it would be necessary, and been given reasonable assistance. Giving someone a list of housing resources and never again discussing with him that he *must* find a new housing resource, then telling him what he needs to do with his existing resource is obtain a high chair, child bed, and baby-proof the cabinets when all the while you consider the resource unacceptable is not only inadequate but counterproductive.

We are confident there are programs to assist those willing workers with criminal records, such as David, to find reasonable work. And even if he could not locate a better job, there are also programs designed to help with subsidized housing and food, and other assistance. These may be the very referrals already offered to David. But if they were offered at a time when he was under the impression that he had the option to remain with his sister, it is perhaps understandable that he did not jump on them.

Clearly, David already had a lot on his plate, and he might well have preferred to retain his current employment (however inadequate for the long run) and remain in his sister's home, with family, while he made the transition into his new role as a full-time dad. Indeed, we might have agreed that was the wisest course, had it been available to him. However, in the view of SSA, it was not, and David deserved to know that. We consequently conclude the services offered to David were inadequate.

V

In any event, even without all the other problems, we would be compelled to reverse the order in this case. The record reflects, quite clearly, that the court deferred to SSA's "discretion" in determining that Susan could not be returned to David's custody while he continued to reside in the same household with this brother-in-law. That was improper.

This was not a determination under Welfare and Institutions Code sections 361.3 and 361.4, concerning placement of a dependent child with nonparental relatives. In that case, the Legislature has given SSA the express authority to veto the placement under certain circumstances.[5] This was instead a hearing

---

[5] Welfare and Institutions Code section 361.4, subdivision (b) provides, among other things, that "[w]henever a child may be placed in the home of a relative, or the home of any prospective guardian or other person who is not a licensed or certified foster parent, the court or county social worker placing the child shall cause a state and federal level criminal records check to be conducted by an appropriate governmental agency through the California Law Enforcement Telecommunications System pursuant to Section 16504.5. . . ." The statute goes

in which SSA had the express burden of proving to the court that the conclusions it had reached were correct. In that situation, SSA's conclusions are merely the starting point, not the ending point, of the analysis.

 We do not deprive parents of their children's custody merely because SSA asks us to. We do not schedule dependency cases for permanency planning hearings which will almost certainly terminate the parent-child relationship forever, merely because SSA asks us to. We do not presume that SSA's judgments about the propriety of returning children to their parents' custody are correct, even if we have previously found them to be correct in other cases. The final, and actual, judgment on the issue belongs to the court, not to SSA. And that judgment must be exercised independently, and in accordance with the proper standards of proof.

## VI

Finally, even if the court had properly determined, based upon its own independent evaluation of the circumstances, that David's brother-in-law posed an unreasonable risk to Susan, we would conclude there was insufficient evidence to demonstrate that danger could not have been addressed through less drastic means. No one was suggesting Susan be left to live with David's brother-in-law alone, and there was no evidence she would ever have to be left alone with him for even a short period of time. David testified he had arranged for Susan to be at daycare while he worked, and otherwise it appeared that both he and his sister would be available to provide for her care.

Both SSA and Susan's counsel assert there would be no guarantee that David would comply with a court order preventing him from leaving Susan alone with the brother-in-law, but he swore under oath that he would, and the record demonstrates he complied with every other order imposed upon him. That is pretty strong evidence in his favor. If an absolute guarantee of safety were required, we have a difficult time envisioning a case in which the court could properly return a child to parental custody. Even the mythical perfect parent cannot *guarantee* anything.

---

on to specify that if the background check reveals that any person over the age of 18 living in the prospective home, or even any other person who "may have significant contact with the child" if he or she were placed in the home, "has been convicted of a crime that would preclude licensure under Section 1522 of the Health and Safety Code, the child shall not be placed in the home, unless a criminal records exemption has been granted by the county, based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child, pursuant to paragraph (3) of this subdivision." (Welf. & Inst. Code, § 361.4, subd. (d)(2).)

In fine, this is one of those rare instances in which we are convinced the dependency system failed in its support for and evaluation of a parent. We are reassured by the effort expended on behalf of David and Susan—by SSA, the attorneys, and the court—but convinced their endeavors were misdirected and led to premature abandonment of this relationship. The difficult decision to permanently separate a two year old and her father requires more than was evident here.

Consequently, the petition for extraordinary relief is granted. The juvenile court is ordered to reconsider its determination that David's brother-in-law presents a substantial danger to Susan's safety, applying its own independent judgment, and indulging no presumptions in favor of SSA's contentions; and if the court concludes Susan cannot be returned to David's custody at that time, issue a new order reflecting that the services provided to David during the final six-month reunification period were inadequate, and requiring SSA to offer additional reunification services. If, after the provision of such services, David is still unable to provide Susan with a suitable residence, the court may reissue the order terminating services and schedule the permanency hearing, or make any other order appropriate to the circumstances at that time.

Rylaarsdam, Acting P. J., and Moore, J., concurred.