Filed 5/13/16  R.C. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| R.C. et al.,<br><br>          Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTA COSTA COUNTY,<br><br>          Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>          Real Party in Interest. | A147686<br><br>(Contra Costa County<br>Super. Ct. Nos. J15-00242, J15-00243) |

A.W. (mother) and R.C. (father) petition this court for extraordinary writ review of a juvenile court order setting a hearing under Welfare and Institutions Code[1] section 366.26 for their twin girls, F.A. and P.A.  Both contend there was insufficient evidence to support the juvenile court's finding that they did not participate regularly and make substantive progress in a court-ordered treatment program, and that they were provided reasonable services.  Mother also challenges the trial court's order terminating her visitation rights.  We find mother's and father's arguments unavailing and deny their petitions.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

## BACKGROUND

In February 2015, the Contra Costa County Children and Family Services Bureau (Bureau) investigated a referral alleging neglect to 5-day-old twins.  The reporting party stated concerns regarding mother's ability to care for the girls due to her history of untreated bipolar disorder, mother's failed court-ordered reunification with her two-year-old child, and mother's lack of prenatal care.

Dr. Joan Roux also expressed concerns regarding the discharge of the twins and father and mother's ability to care for them.  Dr. Roux reported a nurse found one of the babies face down in her crib without supervision on two occasions.  She also stated one baby had been losing weight and the other required follow-up to address possible craniosynostosis, which left untreated could lead to brain damage.

The Bureau talked with Andrea Monah, the social worker assigned to mother's older child, who was in the process of being adopted through San Francisco County Family and Children Services.  Monah stated concerns regarding mother's ability to care for the twins.  She described a pattern of behavior in which mother would parent adequately for a few months, grow frustrated, and then become unresponsive to her child.  A section 300 petition was filed as to the older child, alleging mother physically abused and neglected him.  It was further alleged mother slapped him, ignored or denied any situation in which he needed a diaper change, left him alone and unsupervised, and failed to ensure his attendance at follow-up appointments for his heart surgery.  Monah stated mother had been placed in a residential facility to address her mental health needs.  The intention was to place the older child with her.  Mother stayed at the facility for about three months, then moved away with a boyfriend.  Monah described mother as "impulsive" and unable to put her children's needs in front of her own.

The Bureau filed section 300 petitions as to the twins on February 25, 2015, and the children were detained by the juvenile court the following day.  On April 20, 2015, the juvenile court sustained the petition.  The court found true the allegation that the twins were at risk in the care of mother because she "demonstrated a pattern of behavior in which she will parent adequately for a few months, grows frustrated, and then will

begin to become unresponsive to the child's . . . risk of harm." The court dismissed the allegation that one of the twins had lost weight since birth. Visitation was ordered for mother and father. Each parent was to be allowed to see the children for one hour, two times per week. All parties stipulated to the jurisdiction of the court.

A report filed in connection with the May 2015 disposition hearing recounted mother's prior child welfare history. In brief, it stated mother's older child was born with a heart defect, and was referred to San Francisco County Child Welfare after mother failed to change his diapers, tend to his bandages, and bathe him, among other things. Two different agencies expressed concerns regarding mother's ability to supervise the child during her three-hour visits with him. After reunification services commenced, mother made a greater effort to focus on the child, but her housing and financial instability made it difficult to move to unsupervised visits. Visits with the child were interrupted when mother moved to Sacramento with father. Reunification services for the older child and mother were terminated in February 2015, around the same time the twins were born.

The dispositional report stated mother was enrolled in three parenting classes. One of her instructors stated mother had never missed a class and participated appropriately. Mother was enrolled in an anger management class, she attended weekly therapy sessions, and had been prescribed the drugs Topomax and Wellbutrin. Mother attended all of the twins' doctors' appointments, but she had difficulty remembering dates and needed repeated reminders. Mother stated she needed to work on stabilizing her mental health, and she claimed she had obtained stable housing with her aunt and wanted the opportunity to prove she could care for her children. The report concluded mother's mental health continued to be a concern, and found mother had angry flare-ups, acted impulsively, and in those times mother was unable to put the needs of her children first. On a few occasions, mother's social worker was the target of her angry outbursts. The social worker was also concerned mother had given her monthly transportation pass to father, even though the pass had been given to mother to help her successfully reunify.

3

As to father, the dispositional report stated he had been in trouble with the law since he was a teenager. In 1997, he was convicted of second degree robbery and sentenced to five years in prison. In 2009, he was convicted of false imprisonment, and sentenced to three years' probation. Finally, in 2010 he was charged with infliction of corporal injury on a spouse or cohabitant and served three years' probation and 30 days of jail time. Father said stable housing has always been an issue for him. In September 2014, late in mother's pregnancy with the twins, mother and father moved in with father's mother. The accommodation was short-lived, and they became homeless. They then moved in with mother's aunt. Father felt awkward about not paying rent so he moved in with a friend. That did not work out, and father began to reside in a homeless shelter in San Francisco. Father attended several parenting classes. However, he had not engaged in any of the other recommended services, such as individual therapy, anger management, and a domestic violence program. The report concluded father's unstable housing and indecisiveness—he was confused about whether he wanted to reunify with the twins—caused him to drop into the background.

On June 18, 2015, the juvenile court followed the recommendation of the Bureau and ordered that reunification services be provided to mother and father. The court further ordered visitation to be arranged for mother and father, leaving supervision of the visits to the discretion of the Bureau. A six-month review hearing was calendared for December 3, 2015. It appears that hearing was later continued to December 9, 2015.

In a report submitted in connection with the December 9 review hearing, the Bureau recommended the court terminate reunification services for both mother and father and set a section 366.26 hearing to determine the best possible placement for the twins. The report noted father had recently been arrested, with bail set at $1.9 million. Mother's doctor reported that, although she presented well with her outer appearance, mother became loud and angry when she was confronted about an issue. Mother became loud, angry, and argumentative when the doctor suggested she take a mood stabilizer to address her impulsive behavior and bipolar disorder. The doctor also expressed concerns about mother's cognitive ability to care for the twins, her lack of a support system, and

4

her inability to process through past experiences. As to visitation, the report noted mother had visited the children regularly and attended their doctors' appointments. However, there were concerns mother became flustered and irritated due to the demands of caring for two children at the same time. For example, there were times where one of the children fell back onto the ground while sitting unsecured or while mother was attending to the other child.

The report concluded mother had not addressed her mental health needs and had only engaged in services in order to check them off her case plan. In the opinion of her caseworker, mother easily became overwhelmed and did not have a stable support system to help her be a successful parent. Mother could maintain her behavior for short periods of time, but became easily upset. The social worker observed mother did not begin taking prescribed medication for her bipolar disorder until the caseworker spoke to her about following the recommendations of her psychiatrist. Due to mother's lack of understanding of her own mental health needs and her ability to address those needs, it was clear to the Bureau mother was not in a position to regain custody. Nor was father about to take on this responsibility, as he was incarcerated.

Father later testified he was released from police custody on December 7, 2015, two days before the December 9 status hearing. Father did not attend the hearing or immediately reach out to the Bureau. It does not appear any formal charges were filed.

Mother was twice turned away by courthouse security while trying to attend the December 9 status hearing. According to an incident report, mother attempted to enter the courthouse with four knives, a handheld air horn, and pepper spray in her purse. The items were discovered during a security screening, and mother was informed she could not enter the courthouse with them. Mother grew agitated and left. A short time later, mother returned with the illicit items still in her purse. Mother was again asked to dispose of all weapons, and she left in an agitated state. Mother later returned without the weapons. Her demeanor was rude and aggressive to staff during the incident.

The court set a contested hearing on the Bureau's recommendations for January 20, 2016. In the meantime, on December 16, 2015, the court held an evidentiary

5

hearing on visitation. The transcript of that hearing has not been included in the appellate record. The juvenile court ultimately concluded visits between mother and the twins would be detrimental and suspended those visits.[2]

Mother appeared at the January 20 hearing and father did not. The twins' foster mother testified at the hearing. She had submitted a letter to the court stating mother did not appear to have the proper impulse control or maturity to safely raise the girls. She also believed mother used the girls to fulfill her own needs, was unable to understand the children, and did not seem very attached or committed them.

The social worker also testified at the hearing. She stated father had not engaged in any kind of mental health treatment as required, and "[a] lot" of his noncompliance with the case plan was due to his housing situation. He had lived in a San Francisco homeless shelter, in Sacramento with his mother, and then he was incarcerated. The social worker said she had not had any contact with father since his arrest. As to mother, the social worker stated it was recommended that she take a mood stabilizer for her bipolar disorder. While mother claimed she had taken the medication, the social worker said there was no medical evidence she had done so, as mother had declined to take a blood test. The social worker explained blood tests were ordered because there had been also been concerns about mother's inability to address her mental health issues in her San Francisco case.

The hearing resumed on February 25, 2016. Father appeared and mother did not. The court heard further testimony from the social worker, who stated mother had recently failed to attend two scheduled therapy appointments, as well as a psychiatrist appointment. Mother had also declined to follow through with any of the requested blood work to confirm she had been taking her medication. As to father, the social worker testified he had not notified her of his release from police custody. She believed no charges had been filed against him.

---

[2] Several days earlier, after learning of the December 9 incident at the courthouse, the court had temporarily suspended mother's visitation rights.

Father also testified at the February 25 hearing. He said he had seen an anger management counselor, but the counselor discontinued their sessions "because . . . he couldn't travel back and forth from the Bay to see [father]." Father later testified the anger management counselor terminated services due to lack of payment. The social worker was recalled and stated she contacted the counselor about the payment issue, but father was incarcerated before the issue could be resolved. The social worker further testified father made no attempt to engage in reunification services after he was released from custody.

The juvenile court terminated reunification services to mother and father. It found by clear and convincing evidence that the Bureau provided reasonable services to mother and father, and the return of the twins to the custody of their parents would create a substantial risk of detriment to the safety and well-being of the children. The court set a selection and implementation hearing pursuant to section 366.26 for May 18, 2016.

Both mother and father filed petitions with this court requesting we vacate the section 366.26 hearing, and order reunification services be continued.

## DISCUSSION

### A. *Statutory Framework*

When a minor is removed from parental custody, the juvenile court must generally order the provision of services to the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a).) "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible." (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Parents are generally entitled to 12 months of reunification services. (§ 361.5, subd. (a)(1)(A).) But under section 361.5, subdivision (a)(1)(B), "court-ordered services shall be provided for a period of six months from the dispositional hearing, . . . but no longer than 12 months from the date the child entered foster care" if a minor was under the age of three when removed from the physical custody of his or her parent. The purpose of the shortened period "is to give juvenile courts greater flexibility in meeting the needs of young children, 'in cases with a poor prognosis for family reunification[]

7

(e.g., chronic substance abuse, multiple previous removals, abandonment, and chronic history of mental illness).' " (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 611.)

The juvenile court may extend the time period "if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3).)  In determining whether court-ordered services should be extended, the court shall consider "good faith efforts that the parent or guardian has made to maintain contact with the child." (*Ibid.*)

At the review hearing held six months after the dispositional hearing, but no later than 12 months after the child enters foster care, the juvenile court must order the return of the child to the physical custody of the parents *unless* the court finds, by a preponderance of the evidence, that this would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  (§ 366.21, subd. (e)(1).)  The social worker has the burden of establishing that detriment.  (*Ibid.*)  In making this determination, the court shall consider the criminal history of the parent. (*Ibid.*)  The court shall also consider the efforts and progress demonstrated by the parent and the extent to which the parent has taken advantage of the services provided.  (*Ibid.*)

If a child is under the age of three at the date of the initial removal and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing to terminate parental rights pursuant to section 366.26 within 120 days of the six-month review hearing.  (§ 366.21, subd. (e)(3).)  Notwithstanding the parent's progress, the court shall not set a section 366.26 hearing if (1) "there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months"; or (2) "reasonable services have not been provided" to the parent.  (§ 366.21, subd. (e)(3).)

**B.** *Parents' Participation and Progress in Treatment Plan*

As discussed above, the juvenile court may schedule a section 366.26 hearing if it finds by clear and convincing evidence that the parent has failed to participate regularly

8

and make substantive progress in a court ordered treatment program. (§ 366.21, subd. (e)(3).) Father and mother argue such evidence was lacking here. We disagree and find the trial court's finding was supported by substantial evidence.

Mother argues she made substantive progress because she completed three parent education courses, a domestic violence program, an anger management program, individual therapy, counseling, and a psychological evaluation. Mother also asserts she visited the children on a regular and consistent basis, attended their doctor appointments, and had stable housing. Mother argues the Bureau presented no evidence she was not taking her medication. Mother concedes she attempted to enter the courthouse with knives and pepper spray, and that this was a "poor decision." However, according to her, these actions do not justify the court's decision to set a section 366.26 hearing.

These arguments are unavailing. The statutory standard demands not just progress, but substantive progress. (§ 366.21, subd. (e)(3).) Thus, the juvenile court can also consider whether the parent has made progress toward eliminating the root causes of the removal. (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.) Here, the twins were removed from mother's custody because she previously failed to comply with her case plan for her older child and demonstrated a pattern of behavior in which she would grow frustrated and become unresponsive to her children's needs. There is substantial evidence she has yet to address these issues. The Bureau concluded that while mother had taken some of the steps required by her case plan, she had yet to address her mental health needs, she became easily overwhelmed, and she could only maintain her behavior for short periods of time. Mother's psychiatrist reported mother would become loud and angry when agitated, usually after being confronted on an issue. The psychiatrist also expressed concerns about mother's cognitive ability to care for her children. Likewise, the twins' foster mother stated mother did not have the proper impulse control or maturity to safely raise the girls.

The absence of proof that mother was taking medication is also more significant than mother makes it out to be. Mother's psychiatrist recommended she take a mood stabilizer to treat her bipolar disorder. He reported mother became loud, angry, and

9

argumentative upon receiving this recommendation. The Bureau ordered blood tests to confirm mother was taking the medication because there had been also been concerns about mother's inability to address her mental health issues in her San Francisco case. Despite these concerns, mother refused to submit to a drug test, even after the issue was raised at the January 20 contested hearing.

Contrary to mother's contentions, the court did not base its decision to set the section 366.26 hearing solely on the incident with the knives. Nevertheless, the incident demonstrates a lack of judgment and restraint on mother's part. It is also further evidence of the Bureau's contention that mother had "angry flare ups," acted impulsively, and was unable to put the needs of her children first. Considering the incident with the knives together with the other evidence discussed above, the trial court had ample grounds to find mother had failed to make substantive progress in the court-ordered treatment program.[3]

Father asserts he participated regularly and made substantive progress in his treatment because he visited the twins until he was incarcerated. Father contends he did not visit the children after he was released from custody because he was living in Sacramento, had trouble with transportation, and was without his cell phone, which had the social worker's contact information. Father also contends he completed a parenting class and would have also completed individual counseling and anger management but for payment issues.

We are not convinced. Father made no attempt to pursue individual therapy, as required by his case plan.[4] It also appears father dropped out of the picture after he was incarcerated. Upon his release, father did not immediately attempt to reach out to the Bureau, and he made no serious effort to resume reunification. While father testified he

---

[3] For similar reasons, we reject mother's contention that there was a substantial probability the twins could be safely returned to her custody.

[4] Father asserts he saw a counselor for both anger management and individual counseling. But the agency presented evidence this counselor provided only anger management services.

10

lost his cell phone, he also acknowledged "[t]here were other telephones." Explaining why he declined to reach out, father testified: "I was . . . embarrassed about the things that were being said about me. And I . . . climbed into a little hole." As discussed below, father's incarceration and his failure to follow through precluded the agency from clearing up the payment issues for his anger management and individual therapy. (See section C., *post*.) Moreover, even before father was incarcerated, he expressed confusion about whether he wanted to reunify. In light of father's apparent lack of commitment to reunification, we cannot conclude the trial court erred in finding he had failed to make progress in his court-ordered treatment.

## C.    *Services Provided by the Bureau*

Notwithstanding whether a parent participates regularly and makes substantive progress in a court-ordered treatment plan, a juvenile court may not set a section 366.26 hearing where there is a substantial probability the child may be returned to his or her parent within six months or reasonable services have not been provided to the parent. (§ 366.21, subd. (e)(3); *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 176.) Both mother and father argue the trial court erred in finding reasonable services were provided to them by the Bureau. We disagree.

"In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) "[W]e must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

We conclude substantial evidence supports the juvenile court's determination that reasonable services were provided to mother and father. Among other things, the Bureau discussed with mother the need for therapy and psychiatry, referred mother and father to

11

parenting classes and anger management classes, arranged transportation for visitation with the twins, and provided bus and BART tickets.  The Bureau also drafted a comprehensive case plan for both parents.

Mother asserts the services provided were lacking because her psychological evaluation was not completed until October 2015, four months after the juvenile court ordered it.  Thus, according to mother, she had to wait months for diagnosis and treatment of her bipolar disorder, while she had only a limited time to take advantage of reunification services.  But a prior psychological evaluation of mother was completed in August 2014, about three months before this case commenced.  The evaluation was conducted in connection with reunification services provided for mother's oldest son, and it indicated mother suffered from "major depressive disorder" and "personality disorder not otherwise specified with borderline traits."  The record also indicates mother had been receiving mental health services since at least May 2015.  The social worker testified mother's psychiatrist had recommended medication for her bipolar disorder soon after he began seeing her, in May or June 2015.  Thus, we cannot conclude there was any delay in the provision of mental health services to mother.

Father appears to concede he did not sufficiently participate in individual counseling or domestic violence counseling, but he argues this was due to a "payment issue[] with the counselor."  Below, the Bureau asserted the payment issue was a result of the anger management counselor's failure to submit required forms.  Father now argues the Bureau should have worked harder to get the counselor paid or to find father a new counselor.  However, the evidence suggests the Bureau did try to resolve the payment issue soon after it arose, but father was incarcerated before that issue could be resolved.  There is also evidence that once father was released from custody, he failed to contact the social worker and did nothing to reengage with the reunification process.

Father also attributes his failure to follow through on the case plan to his precarious housing situation, and argues the record shows the Bureau did not provide him with any services to help with that problem.  In this respect, father asserts this case is analogous to *In re P.C.* (2008) 165 Cal.App.4th 98 (*P.C.*), which reversed an order

12

terminating parental rights, and *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 (*David B.*), which granted a petition from an order setting a permanency planning hearing. Both cases are readily distinguishable.

In *P.C.*, the court found parental rights could not be terminated when the only detriment to returning the children to the mother was her inability to obtain housing acceptable to the social services agency. (*P.C.*, *supra*, 165 Cal.App.4th at pp. 99–100.) It was held that poverty alone, even when it results in homelessness, was not a sufficient ground to deprive the mother of her parental rights. (*Id.* at pp. 99–100.) On remand, the juvenile court was to order the agency to provide reunification services, including assistance to obtain stable, suitable housing. (*Id.* at p. 108.) Unlike the instant action, the mother in *P.C.* had completed all of the services required by her case plan, and the social worker testified the mother's housing situation was the only thing preventing her from getting her children back. (*Id.* at p. 101.) In contrast, here, father expressed ambivalence about whether he wanted to reunify, dropped into the background, and then abandoned his reunification efforts altogether after he was incarcerated.

Likewise, the father in *David. B.* "did virtually everything [the agency] requested of him, and then some." (*David B.*, *supra*, 123 Cal.App.4th at p. 772.) Nevertheless, the agency recommended against reunification because of the father's housing situation. (*Id.* at p. 793.) The court found that the agency had provided the father with misleading guidance on this issue. (*Id.* at p. 796.) The agency ultimately determined the father needed to find a new home to accommodate his child, but it had not clearly communicated this requirement to him earlier. (*Id.* at pp. 795–796.) The agency had merely given him a list of housing resources and never again discussed the issue with him. (*Id.* at p. 796.) The court explained: "[T]elling [the father] what he needs to do with his existing [home] is obtain a high chair, child bed, and baby-proof the cabinets when all the while you consider the [home] unacceptable is not only inadequate but counterproductive." (*Ibid.*) Here, there is no indication the agency misled father about what he needed to do to reunify. Moreover, the agency ultimately recommended against

reunification not because of father's housing situation, but because he was incarcerated and then abandoned efforts to reunify.

**D.**    *Termination of Visitation*

Finally, mother challenges the juvenile court's order terminating her visitation with the children.  But mother did not separately appeal that order.  She merely filed a writ petition pursuant to California Rules of Court, rule 8.452, which only allows for the review of orders setting a section 366.26 hearing.  Thus, the trial court's visitation order is not properly before us.  Even if it was, mother failed to include in the record a transcript of the December 16, 2015 evidentiary hearing on visitation.  Without a record of these proceedings, mother cannot possibly make an affirmative showing of error.  Accordingly, we decline to disturb the juvenile court's order terminating visitation.

## DISPOSITION

Mother and father's petitions for an extraordinary writ are denied on the merits.  (Cal. Rules of Court, rule 8.452(h)(1).)  The request for a stay of the selection-and-implementation hearing under section 366.26 scheduled for May 18, 2016, is denied as moot.  The decision is final in this court immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
DONDERO, J.

We concur:

_____
HUMES, P. J.

_____
BANKE, J.

14