Filed 7/1/16  In re D.B. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | B267553 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>C.J.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DV03835) |

APPEAL from an order of the Superior Court of Los Angeles County, Connie R. Quinones, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

C.J. appeals from the order of the juvenile court at the 18-month review hearing that terminated reunification services for her and her eldest son D.B. and denied her request to return the child to her custody. Mother contends there is no evidence that it would be detrimental to D. to return him to her care. (Welf. & Inst. Code, § 366.22.)[1] We conclude the evidence is sufficient to support the detriment finding. Accordingly, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Detention – February 2014*

By herself, mother has been raising six children: boys, D. (age 17), D'Marcus B. (age 15), M.B. II (age 14), Messiah B. (age 12), and girls, Jada J. (age 11), and Leilani M. (age 2). The Department of Children and Family Services (the Department) logged 10 calls about this family between January 2005 and May 2013 alleging abuse and neglect. Mother admitted she disciplined the children by hitting them with objects. A case was opened in 2008 because mother physically abused M.

In February 2014, the school reported to the police that M. had a bruise in his eye and claimed that mother stuck her finger in it and choked him. Mother explained, and M. confirmed, that to stop his tantrum, she yelled at him, slapped and choked him, and smashed his cheeks. Because M. was aggressive and becoming increasingly difficult to handle, mother asked the Department for help. The Department filed a petition.

2. *Jurisdiction – October 20, 2014 & Disposition - November 24, 2014*

M. reported to the Department that mother " 'use[d] to whoop us with belts, extension cords and wood sticks' " until five years ago. She resumed whooping the older children with flat shoes and belts but stopped again just months earlier. " 'Now she (mother) makes us do push-ups or standards . . . .' " or puts him outside without shoes. M. admitted that he would get angry and throw lots of tantrums, punch and sock Messiah, run away, and steal. At school, he threw himself on the floor or walked out of class.

---

[1] All further statutory references are to the Welfare and Institutions Code.

Mother would whoop him for this behavior. A psychiatric hospital prescribed medication that M. did not regularly take.

Mother was unable to handle M. His behavior prompted his siblings to act out. Messiah stopped listening to mother. The two stole from her, the babysitter, and from teachers. The siblings got into fights. Mother stated, " 'All of my other children are acting out because of [M.]. I just want him ([M.]) in an environment where he can be safe because I cannot control him.' "

To deal with the chaos, mother would call the police and the Psychiatric Emergency Team (PET), ask D'Marcus and D. to intervene, or put M. outside until he calmed down. She claimed that after the court told her not to use corporal punishment, she stopped. However, maternal aunt Yvonne J. revealed that mother was "very abusive both emotionally and physically towards the minor children," " 'all the time.' " D. was sleeping on the floor because he wet the bed. D. corroborated that mother severely physically disciplined the children.

Yvonne also revealed that maternal uncle Willie H. sexually abused D. when the child was two years old. Willie, who lives in Texas, came to California in 2013, and mother let him stay at her house. Later, mother sent D. and D'Marcus to visit the maternal grandmother in Texas with whom Willie lived. Mother was aware that D. acted out sexually with all of his siblings. Investigation also revealed that D. and M. vomited and defecated on each others' belongings.

The Department was "very concerned" about mother's ability to control and appropriately supervise M. He lied, stole, and fought with siblings, bit, scratched, punched, and choked them, destroyed property, screamed, and ran away. Mother had him hospitalized twice since the petition was filed. The Department recommended that M. be removed from mother and placed in foster care until his mental health and behavior stabilized. In the Department's opinion, M. posed an immediate threat to his and his siblings' safety and well-being.

The juvenile court detained D. and M. from mother after finding that staying home was contrary to the boys' welfare. The foster mother reported that D. acted sexually

3

inappropriately with his brother and had disclosed the sexual abuse to her. D. was placed in a group home.

The juvenile court sustained the amended petition alleging that mother physically abused the children, and that she knew that D. was sexually abused by his maternal uncle Willie H. but failed to protect the children. (§ 300, subds. (a), (b), & (d).) As for disposition, the court removed D. and M. only from mother's custody (§ 361, subd. (c)) and awarded mother unmonitored visits. The court ordered family maintenance services for the four children who remained at home. It fashioned a reunification plan for D., M., and mother that required mother to (1) complete a parenting course focusing on children with special needs and behavioral issues, (2) undergo individual counseling to address case issues, and (3) sex abuse awareness counseling. The court also ordered individual counseling and Wraparound[2] services for D. and M. and conjoint counseling if recommended by the children's individual therapists.

3. *The six-month review period -- December 2014 through June 2015*

D. disliked his group-home placement and acted out by behaving disrespectfully to staff, refusing to follow rules, or to attend class, even after being moved to a small, private school. With the help of the Wraparound team, D. agreed to move to a familiar foster home. A month later, he was placed with his godmother, where he began attending school and became more cooperative. Still, he had not received any sex-abuse counseling although his therapist agreed to treat the child with trauma-focused therapy. He needed more time and services before he could safely return to mother's care.

M. was also becoming more cooperative, although he was angry. He was learning to show restraint and by May 2015, he appeared ready to return to mother.

Mother was initially uncooperative and combative about the Wraparound services she received and announced in March 2015 that she no longer needed that help. Her home remained chaotic, however. Messiah stole from a local store, and Jada acted as

---

[2] Wraparound serves high risk youth with serious emotional and behavior problems by providing a variety of programs and services tailored to the needs of the particular youth and family as an alternative to residential or group institutional care.

lookout while he stole money from mother's purse. Mother was at a loss about what to do. After the Wraparound facilitator was changed in April 2015, mother became more cooperative and willing to accept services. The new facilitator decided that mother was diligent with the children's school work and in correcting D'Marcus and Messiah when they were caught stealing.

By May 2015, it was decided at a team decisionmaking meeting (TDM) that mother was able to manage the children. The Department found that mother had been diligent and stable through the challenges the children posed. She responded appropriately when Messiah stole. She turned to the Wraparound team and the social worker for help when D'Marcus announced he no longer wanted to remain at home and began to steal. D'Marcus changed his mind about moving out and Jada was no longer abetting Messiah when he stole. Additionally, mother's discipline methods had improved. She was firm and non-abusive. Although the children did not immediately respond, they respected and wanted to please her. As of May 2015, mother "appear[ed] to be able to care for the children's need[s]."

However, mother was only partially compliant with court orders. She enrolled in a parenting course in May 2015. The social worker confirmed that, while mother was an active participant in counseling, she only came to every other session for a total of 13 meetings. She needed to do additional work. Thus, because mother was in partial compliance with her case plan, the Department recommended that the juvenile court terminate jurisdiction for all children except M. and D.

At the six-month review hearings for D. and M., the juvenile court returned M. to mother but maintained D. in his placement. The court continued reunification services for D. and retained its jurisdiction over all of the children.

4. *The twelve month review period – July 2015 through October 2015*

In August 2015, the Department reported that D. remained stable and continued to visit mother. He declared himself ready to go home. He was doing well in school and enjoyed his placement. He felt safe when he visited mother. In contrast, D.'s therapist reported that the child "has *not* adjusted well to placement. [The therapist] stated he

5

continues to exhibit behavior *that is not age appropriate*." (Italics added.) D. admitted that he fought and rough-housed "too much" with his brothers and mother appeared to be "over-loaded."

The Department began receiving referrals. In August 2015, a camp counselor revealed that mother was leaving D. in charge of the other children during weekends when she was away. He hit the children with force, and punched, kicked, and slapped them in the face when they did not listen to him. The Wraparound team set goals for D.: he would learn to control his emotional outbursts, inappropriate language, disrespectful and inappropriate behavior at home and at school. Notwithstanding, in August 2015, the Department reported, although mother appeared to be acting appropriately and encouraging D. to make good decisions, that D. was unable to apply her directions and had not met his goals.

The Department received another referral in late September 2015. Mother had punished D'Marcus and M. twice by denying them dinner and kicking them out of the house while they were wearing only underwear. The children went to a neighbor who called the police.

Mother informed the Department that she could not afford therapy and requested assistance. The Department gave mother referrals and called each agency for her. Mother did not follow up and stated she did not plan to enroll in counseling. Hence, in August 2015, the Department recommended terminating reunification services for mother and D. because she had not yet complied with the court's orders to participate in individual counseling to address sex abuse.

Mother met with therapist Frank Smith, MFT, of Starview Wraparound services. Smith found that mother would benefit from twice-monthly individual counseling sessions in her home to address support, stress management, and cognitively-based coping skills, notwithstanding mother's belief that she did not need counseling because the Department met her needs. Smith saw "no real red-flags" except that mother appeared angry and overly assertive. Smith's supervisor opined, however, that mother's ability to parent the teenagers remained a concern.

D. was doing well in his placement.  He reported feeling happy and safe.  He was scheduled to graduate from high school on time.  Mother recognized that although she wanted D. to return home, she was struggling with D'Marcus and M.  Mother had not started therapy.  Therefore, the Department recommended terminating reunification services for mother because returning D. to her custody could put a significant amount of pressure and stress on her and put the other children at risk.

5. *The 18-month hearing* (*§ 366.22*) *– October 2015*

At the section 366.22 hearing, mother presented a letter from D.'s school indicating that she had maintained communication with the school and helped the child improve his attendance and academic performance.  A letter from the Wraparound team recommended that D. return home.  Counsel stipulated that D.'s caregiver would testify that she was in favor of the child's return home.  The family had had Wraparound services for 18 months.

Mother testified that D'Marcus and M. continued to be a challenge and were struggling with their behavior.  The family was working it out with the Wraparound team, who assisted mother and taught her communication skills.  Mother explained the events of September 15 that led to the latest referral:  D'Marcus and M. stole $60 from D.'s caregiver.  Mother punished the children by forbidding them to watch TV or to go outside.  She immediately called the Wraparound team and put M. and D'Marcus in respite care for a week.  In another incident, M. became aggressive toward his siblings and tore up their school books.  D'Marcus told mother about the incident and so she put M. outside where he screamed continuously from around 5:00 p.m. until about 8:00 p.m., when the police arrived.  Mother called the Wraparound team.  At the time of the hearing, both M. and D'Marcus were in respite care where they had been for about a week.

Still, mother wanted D. returned to her.  She estimated that D. had been having overnight visits with her for seven months.  His behavior had improved and he got along with his brothers "perfectly fine."  She revealed that D. had "a play fight" with a sibling. She "immediately redirected the situation, *took him back over there to placement so he can calm down and let him get some time to himself.*"  (Italics added.)  If she had trouble

7

disciplining the children, she called the Wraparound team. Mother never spoke to D. about the sex abuse. She had planned to put D. in intensive trauma-focused therapy but she claimed he did not qualify for that service. Asked when she would be ready to have her children back with her, mother replied that she could put M. and D'Marcus in respite care for up to 30 days. She planned to use two of those weeks now and save two weeks in case she needed them later. Although it was in her control, she was not sure when she would arrange for M. and D'Marcus to be released from respite care. She was "*dealing with one thing at a time*." (Italics added.)

As for mother's participation and progress in her case plan, she had not commenced therapy. She had completed 12 counseling sessions in the spring of 2014, during which she discussed case issues including sex abuse. Mother claimed to have completed a parenting class.

D. testified he "badly" wanted to return home.

6. *The ruling*

Finding by a preponderance of the evidence that return of D. to mother's physical custody would create a substantial risk of detriment to his safety, protection or physical, emotional well-being, the juvenile court declined to return him to mother and terminated reunification services for mother and D., but not for the other children. The court found "a lot of chaos going on in this home. And there's a lot of risk still posed to the children." D'Marcus and M. were put in respite care because of their unruly and out-of-control behavior, ranging from stealing to fighting, outbursts, and creating "such havoc in this home with mom and the other siblings." D. had acknowledged in August that he and his brothers rough-housed too much and that mother appeared to be "over-loaded." The court found it to be "a problem" that after M. was returned to mother's care, she put him and D'Marcus in respite care. Thus, it was not in D.'s best interest to return to mother's custody. Rather than to set the selection and implementation hearing (§ 366.26), however, the court scheduled a review hearing.

DISCUSSION

At the 18-month mark, the juvenile court must order the return of the child to the physical custody of his parent *unless* the court finds, by a preponderance of the evidence, that the return would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. (§ 366.22, subd. (a).) We review this finding for substantial supporting evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

In making its determination, section 366.22 directs the juvenile court to consider the efforts and progress demonstrated by the parent and the extent to which she availed herself of services provided. (*Id.*, subd. (a).) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Id.*, subd. (a)(1).)

There is no dispute that mother did not participate regularly or make substantive progress in court-ordered treatment. Her attorney acknowledged as much. This dependency was triggered because the methods mother used to manage her uncontrollable children was physically abusive and because knowing about the sex abuse she still allowed Willie H. to have access to D. The court-ordered case plan designed to address the causes of the dependency required mother to (1) complete a parenting course that focused on children with special needs and behavioral issues, (2) undergo individual counseling to address case issues, and (3) undergo sex abuse awareness counseling. Mother irregularly attended counseling at least six months earlier without completing it, and offered no evidence that she completed a parenting course, both of which services were designed to help her learn how to handle her children. Moreover, the only evidence that mother underwent sex abuse awareness counseling was her own testimony, and she

9

admitted she never spoke with D. about the abuse. Mother's failure to participate in her case plan is prima facie evidence of detriment. (§ 366.22, subd. (a).)[3]

In addition to this prima facie evidence of detriment, mother remains unable to control her difficult and challenging children even with the intensive maintenance and Wraparound services she has been depending on for 18 months. Mother testified that during a recent visit, D. began fighting with a sibling and her method of discipline was to take "*him back over there to placement so he can calm down and let him get some time to himself.*" (Italics added.) D. acknowledged in August 2015 that mother was "over-loaded." Messiah and D'Marcus have become difficult to control and mother has had to put D'Marcus in respite care with M. Put differently, mother is only able to cope by relying on others: the Department, the police, the Wraparound team, hospitalization, PET, or respite care. Even so, mother continues to manage M. by banishing him outside, alone for hours, while he screams. The court agreed with D.'s attorney who described this method of punishment as "bizarre" and "not a way to deal" with an out-of-control child. Mother claims to want D. home even while she put M. and D'Marcus in respite care because she needs time off from the stress and chaos that her children create. As recent as the 18-month hearing, mother admitted she was not capable of having all of her sons together because, she explained, she was not sure when she would arrange for M. and D'Marcus to be released from respite care as she was "*dealing with one thing at a time.*"[4] (Italics added.) Already overwhelmed and unable to safely care for the five children in

---

[3]     *In re E.D.* (2013) 217 Cal.App.4th 960, and *In re Yvonne W.* (2008) 165 Cal.App.4th 1394 are distinguishable. In both cases, the parents seeking to regain custody had completed their case plans. (*In re E.D.*, *supra,* at p. 964; *In re Yvonne W.*, *supra*, at p. 1401.)

[4]     Mother's reliance on *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 is unavailing. The appellate court there found that the father's reliance on others for assistance in caring for the baby was not improper because the questions he asked demonstrated "an appropriate concern about significant issues." (*Id.* at pp. 790-791.) In contrast, mother continues to rely on the Department, the police, respite care, psychiatrist and hospitalization because she is still unable to safely and appropriately care for her children by herself.

10

her custody, the record supports the juvenile court's finding mother cannot also safely care for D. Consequently, the evidence supports the juvenile court's finding that mother has made little progress in addressing the causes of this dependency. (§ 366.22, subd. (a).)

We are aware that the record does contain some evidence that could support returning D. to mother. The juvenile court admitted into evidence the Wraparound team's letter of October 9, 2015 recommending the child's return home. Yet, mother acknowledges that it "is unclear [from] this letter whether [the author] was fully aware of the recent incidences [*sic*] reported" involving mother's use of respite care and banishment. Moreover, just two weeks earlier, the author of that letter, the Wraparound facilitator and Smith's supervisor, told the Department that "*part of the concern for mother is her ability to parent the teenagers in the home*." (Italics added.) The juvenile court considered this evidence. We may not reassess its effect or value, or resolve conflicts or substitute our inferences therefrom. (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52-53.)

Mother also makes much of the facts that D. "badly" wanted to return home, that his behavior had improved, and that he was scheduled to graduate from high school on time. However, as the juvenile court explained to the child, the question before it was not whether *D.'s* behavior improved so that *he* merited return, but whether *mother* had made progress such that *she* could provide an environment free of danger to D.'s safety and physical and emotional well-being. (§ 366.22, subd. (a)(1) [in determining detriment, the court must consider the *parent's* efforts and progress; the *parent's* failure to participate regularly and make substantive progress is prima facie evidence of detriment].) D.'s improvement is certainly deserving of praise. However, it is not the major factor for the court to consider under section 366.22.

In sum, mother is still unable to safely and adequately care for all four teenaged boys at once, with the result substantial evidence supports the juvenile court's finding that returning D. to mother would be detrimental to his safety and physical and emotional well-being.

Finally, mother contends that the juvenile court should have extended reunification services for an additional period for D. beyond the 18-month maximum. However, mother has forfeited this argument on appeal because she did not raise it below. (*In re K.P.* (2015) 242 Cal.App.4th 1063, 1073.)

DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, Acting P. J.

We concur:

LAVIN, J.

HOGUE, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.