Filed 12/29/23  A.W. v. Superior Court CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| A.W.,<br><br>        Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Real Party in Interest. | B329613<br><br>(Los Angeles County Super. Ct. No. 21CCJP02493A) |

ORIGINAL PROCEEDINGS.  Gabriela Shapiro, Judge Pro Tempore.  Petition granted.

Melissa A. Chaitin and Emily Berger for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, and David Michael Miller, Senior Deputy County Counsel, for Real Party in Interest. Sarah Liebowitz for Minor E.C.

The juvenile court assumed dependency jurisdiction over then-one-year-old E.C. and removed her from the custody of her parents based on the parents' history of engaging in violent altercations in her presence, her father J.C.'s (Father's) drug use and mental health issues, and the mental health problems experienced by her mother A.W. (Mother). Two years later, and at the urging of minor's counsel—though not the Los Angeles County Department of Children and Family Services (the Department), the juvenile court terminated family reunification services and set a permanency planning hearing. In this extraordinary writ proceeding filed by Mother to challenge the setting of the permanency planning hearing, we consider whether substantial evidence supports the juvenile court's finding that E.C.'s health or safety would be at substantial risk of detriment if she were returned to Mother's care.[1]

## I. BACKGROUND

### A. Initial Dependency Proceedings

In March 2021, the Department began investigating domestic violence between the parents and Father's mental health issues as both were relevant to E.C.'s welfare. That day, law enforcement responded to a loud argument between the parents at the family home; Father had thrown furniture, causing a laceration to his hand, and E.C. was crying.[2] Father

---

[1] The Department declines to defend in this court the orders made by the juvenile court. That defense is instead provided by counsel for E.C.

[2] Law enforcement had responded to the home previously, when Mother was pregnant with E.C. On that occasion, the

3

also had a methamphetamine pipe in his pocket and reported using methamphetamine earlier that day.[3]

The Department's initial conversations with the parents revealed Mother had been diagnosed with bipolar disorder and Father was a longtime user of methamphetamine. Father also admitted he occasionally took Mother's prescription Xanax and he had been placed on an involuntary psychiatric hold in 2019.

In May 2021, the Department filed a juvenile dependency petition alleging that the parents "have a history of engaging in violent altercations in the presence of the child," that Father "has a history of substance abuse and is a current abuser of methamphetamine and prescription medication," and that Mother and Father have mental and emotional problems that render them "incapable of providing regular care for the child." At an initial detention hearing, the juvenile court ordered E.C. placed with her paternal aunt and ordered both parents to have separate monitored visits.

Within two weeks of this placement, the paternal aunt reported that Mother was harassing and threatening her. E.C. was then placed with a maternal cousin.

The following month (June 2021), the Department learned Father had been arrested after an argument with Mother during which he placed her in a headlock. Father verified the arrest and revealed Mother told him not to tell the Department about it.

---

parents had an argument during which Father threw a television and speakers.

[3]     Father later tested positive for methamphetamine use.

In advance of the jurisdiction hearing, Mother began taking parenting and anger management classes. She also participated in eight sessions of domestic violence classes before the services were paused due to the instructor's concern about Mother's mental health. The instructor recommended Mother "participate in one-on-one sessions due to mother having many questions and having difficulty applying what she learns in class." Mother then tried individual sessions, but they "did not work out" because "mother did not appear to understand the information." Father participated in only two domestic violence classes and was then dropped from the program.

Around the same time, the Department learned Mother and Father were visiting E.C. together despite the court's order for separate visits. When confronted, Mother denied this and further denied there had ever been any domestic violence between Father and her.

At the jurisdiction hearing in September 2021, the court sustained the dependency petition and continued the matter for disposition.

Thereafter, many of Mother's visits with E.C. went well, but there were occasions where she behaved inappropriately. During one visit, Mother slapped the maternal cousin and left with E.C. before being persuaded to return. On another occasion, Mother went to the maternal cousin's home with law enforcement and demanded to see E.C., which the maternal cousin allowed. During another visit, Mother threatened to take E.C. home with her because, she said, the Department and the court did not care about her case. At a different visit, this time at a mall, Mother put E.C. in a stroller and "began to speed walk" away until the social worker lost sight of them both. The police were called and

eventually located Mother and E.C. in the mall. Apart from the visits, Mother also exhibited some odd behavior, including when she contacted the Department multiple times and asked that E.C. be returned to her—offering "$100 million bazillion trillion dollars" and "the universe and all the stars in it" if E.C. were returned to her.

In January 2022, Mother began a new domestic violence program. Later, however, the program's director later withdrew Mother's enrollment. The program director believed Mother had a cognitive impairment that interfered with her *ability* to participate.

At the continued disposition hearing the following month, the juvenile court declared E.C. a dependent of the juvenile court and ordered her suitably placed. Mother was ordered to complete individual counseling, a domestic violence support group for victims, conjoint counseling with Father, and a psychological evaluation. Father was ordered to submit to drug testing and to complete a drug and alcohol program with aftercare, a domestic violence program, individual counseling, and a psychological evaluation. The court ordered separate monitored visitation for both parents.

### B. The First Review Hearing

Mother thereafter re-enrolled in a domestic violence program. According to the program director, Mother shared her experiences in sessions and understood domestic violence was not just physical and could involve emotional and verbal abuse, intimidation, and threats. Mother also enrolled in a program related to family support and education for sobriety and participated in conjoint therapy with Father. Mother was in

6

individual therapy and taking her medication. She began having unmonitored visits with E.C. in May 2022.

Father completed anger management and parenting courses. He also completed a residential substance abuse treatment program and enrolled in an outpatient substance abuse program. Father was later discharged from the outpatient program, however, due to lack of attendance. Mother admitted that she told Father to stop attending the outpatient program to save money on gas.[4]

At the August 2022, review hearing, the court ordered continued reunification services for both parents and allowed the parents to have monitored visits together. The Department was also given discretion to further liberalize visitation

C.     *The Second Review Hearing*

Mother completed her domestic violence program in October 2022. A progress letter stated Mother's participation in the sessions steadily improved and she said she was aware of the dangers of domestic violence and would not live in an abusive relationship again. Mother additionally completed a family support and education for sobriety program. The parents also completed 20 sessions of conjoint therapy and their therapist reported that they had engaged in therapy "very well." Mother continued seeing her own therapist.

---

[4]     The Department reminded Mother that they had been offered bus passes so that Father could attend his programs. Mother retorted that her domestic violence program instructor told her "it is mental abuse to require so much from one person."

A Department social worker advised Mother of concerns she was not taking prescribed medication to address her mental health issues.  Mother asserted she was taking her medication as directed but had combined medication and moved pills into a bag to keep them away from Father.

Father enrolled in substance abuse classes.  While he tested negative ten times during this period of review, he also failed to test on 11 occasions.  Father was not enrolled in individual counseling, nor had he completed a psychological evaluation.  Both parents were visiting with E.C. three times a week and, beginning in December 2022, they had unmonitored overnight visits.

At the second review hearing in February 2023, the court found there were exceptional circumstances—namely, Mother's compliance with her case plan—that warranted continuing reunification services for the parents.  The court, however, suspended Father's overnight visits and ordered that his visits be monitored—while giving the Department discretion to liberalize Father's visits once his drug tests were negative and he participated in programs.  The court permitted Mother to have unmonitored visits and gave the Department discretion to allow overnight visits (without Father being present) if Mother was taking her prescribed medication and following court orders.

D.     *The Final Review Hearing and Termination of Reunification Services*

Before the final review hearing, Mother was having two overnight visits with E.C. each week and the visits were reported to be going well.  In addition, and with encouragement from her attorney and her "parent partner," Mother had Father move out

8

of the family home in March 2023; she reported she felt bad asking him to leave but decided there was nothing more she could do for him. Mother also asked the assigned social worker if it was a good idea to request a "stay away" order for Father; she explained he was "more loving and supportive than ever" and was not showing up at the family home, but Mother wondered whether requesting a stay away order would leave her in a better position when she appeared in court the following month. The social worker did not recommend Mother obtain a stay away order and instead reminded Mother that there was an existing order preventing Father from being present during Mother's visits with E.C.[5]

---

[5] In interactions with the Department, Mother continued to advocate for Father. Mother at one point raised the possibility of moving out and leaving Father the family home, but the Department advised her not to jeopardize her housing (which was also E.C.'s home). In addition, Mother filed a complaint about Father's case plan to try and arrive at a "fair amount of work" that would be "achievable." Mother also filed two requests to resume overnight visits for Father, both of which the court denied.

E.C. also told the Department about an occasion on which Father picked her and Mother up in a car. In addition, during one of Mother's overnight visits with E.C., a social worker texted Mother and asked her to sign some forms. Mother sent "live" photographs of the signed forms that also captured brief snippets of audio, and the social worker could hear Father speaking in the background. Mother admitted Father was at her home on that occasion, but she claimed it was only so Father could sign some documents and she told the social worker it would not happen again.

By April 2023, Mother completed all elements of her case plan, including the domestic violence support group. Mother and Father also restarted conjoint counseling even though they previously completed a conjoint counseling program. Mother's individual therapist advised the Department that Mother attended all therapy sessions and put forward her best effort. The therapist further opined that he supported the court granting Mother custody of E.C. because he believed Mother would never physically or emotionally harm her daughter and he "trust[ed] her to keep her daughter safe." Mother's treating psychiatrist (for over 14 years) advised the Department that Mother's condition was stable, she was compliant with her medication regimen and treatment plan, she was not a danger to herself or others, and there were "no psychiatric conditions which would preclude her from taking care of her child."

That same month (April 2023), E.C. became ill with the stomach flu. The maternal cousin informed Mother of the diet recommended by E.C.'s doctor, but Mother declined to follow the doctor's instructions and followed her own "'better list of healthy foods.'" Mother then responded that she was turning off her phone to take care of E.C. The next day, a Department social worker asked Mother for an update. Mother sent a picture of E.C.'s breakfast, which did not comply with the doctor's instructions. The social worker informed Mother she was going to come to the home to check on E.C. Mother then had the maternal cousin come pick up E.C. and the maternal cousin told the Department that E.C. had no energy and was not keeping food down.

In the meantime, Father's contact with the Department was sporadic. He had not set up his schedule for monitored

10

visitation or responded to the Department's efforts to arrange his psychological evaluation.  He changed his phone number at one point, which the Department did not know until informed by Mother.  The Department also reported that before he moved out of the family home, Father tested positive for a drug Mother was prescribed—although Mother insisted she had hidden her medication and denied noticing any medication had gone missing.

The juvenile court held the final review hearing in May 2023.  Counsel for Mother and Father both argued E.C. should be returned to Mother's custody.  Mother's attorney emphasized Mother had been having successful overnight visits with E.C. and had complied with all elements of her case plan.  Counsel also added a personal observation that Mother was "a client who is easy to work with[ ] because she's so communicative and available, and she always puts the well-being of her daughter first."  Reiterating without elaboration its recommendation in a report filed before the hearing,[6] the Department agreed E.C. should be returned to Mother.  Contrary to the recommendations of the other parties, E.C.'s attorney argued reunification services should be terminated and E.C. should not be returned to Mother's custody.  Minor's counsel acknowledged it was a "tough situation" and expressed "appreciat[ion for] what Mother has done," but counsel believed it was best to move forward with permanency planning while still "encourag[ing] . . . Mother to stay in her programs and to possibly file a [changed circumstances petition] in the future."

---

[6]     The court stated on the record that it held an unreported conference with the parties before the hearing and conveyed its tentative intent not to follow the Department's recommendation to return E.C. to Mother's custody.

11

The juvenile court sided with minor's counsel and found "by a preponderance of the evidence that return [of E.C. to Mother's custody] is detrimental." The court acknowledged Mother "has technically complied with court-ordered programs" and confessed the question of whether to return E.C. to Mother was not an "easy decision for the court to make." But to justify its ruling, the court cited comments from Mother's early service providers that Mother could not grasp the concepts being taught; Mother's continued defense of, and advocacy for, Father (who had not completed any of the court-ordered programs or participated meaningfully in visits); and the court's belief that Father was routinely present at Mother's home with E.C. in violation of the court's order for separate visitation. The court also cited Mother's "inability to have rational conversations with people" and the aforementioned instance when "[M]other . . . demonstrated that she[ was] incapable of following doctor's instructions" while E.C. was suffering from stomach flu.

The juvenile court set a permanency planning hearing, discontinued overnight visits between Mother and E.C., and granted Mother unmonitored visitation in a neutral location on the condition that Father would not be present. The court also noted it was considering a plan of guardianship because the court was not certain "termination of parental rights would be appropriate at this time."

## II. DISCUSSION

Mother argues insufficient evidence supports the juvenile court's finding there was a substantial risk of detriment to E.C. if she were returned to Mother's custody. Although the applicable substantial evidence standard of review is deferential, we agree

12

the evidence does not satisfy the statutory standard for refusing to return E.C. to Mother.  On this record, any evidence suggesting a risk of detriment to E.C.'s safety, protection, or physical or emotional well-being is not a substantial risk.  The arguments minor's counsel offers to reach a contrary conclusion, which rely on nebulous concerns of a "lack of insight" shown by Mother's continued interactions with Father, are unpersuasive.[7]

Under Welfare and Institutions Code section 366.25, a juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (Welf. & Inst. Code,[8] § 366.25, subd. (a)(1).)  "That standard is construed as a fairly high one.  (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789[ ].)  It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other family member. (*Ibid.*)"  (*M.G. v. Superior Court of Orange County* (2020) 46 Cal.App.5th 646, 660.)  Our review of the

---

[7]     Because we shall reverse the juvenile court's order terminating reunification services and remand the cause for further proceedings, we need not decide Mother's separate contention that the juvenile court's monitored visitation order was an abuse of discretion.

[8]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

juvenile court's detriment finding is for substantial evidence. (*Id.* at 661.)

There is no substantial evidence of a substantial risk of detriment to E.C. in this case. Indeed, the pertinent facts are almost entirely undisputed. Mother successfully completed her court-ordered case plan, including a domestic violence support group and conjoint counseling with Father. She was having overnight visits with E.C. twice per week that went well. Mother's therapist opined he trusted her to keep E.C. safe. And Mother's longtime treating psychologist advised she was stable, compliant with her medication regimen and treatment plan, and suffered from no condition that would preclude her from taking care of E.C. On this record, it is difficult to fathom what more Mother could have done to demonstrate the absence of a substantial risk to E.C.'s safety and welfare while in her custody. (*M.G., supra,* 46 Cal.App.5th at 663 ["if these parents, who got clean and sober, attended and completed all of their services, and had overall positive visitation with the children, could not get their children back at the 18-month review hearing, we are at a loss to see what parent could"].)

Minor's counsel, however, attempts to defend the order the juvenile court made largely by highlighting Father's shortcomings and asserting the lack of any evidence that Mother had cut off her relationship with him suffices to show a lack of insight that establishes the requisite detriment to E.C. There are several problems with this, however.

First, the record reveals Mother has the ability to set limits on her interaction with Father if needed to protect E.C.: she had him move out of the family home, and she went further and asked the Department whether she should obtain a "stay away"

14

order against him to, as the Department recounted it, "demonstrate that she is protecting her daughter from [Father]" (the Department, apparently, demurred).

Second, the concern about continued interaction with Father does not account for Mother's participation in court-ordered services. While Mother's relationship with Father was problematic at the start of dependency proceedings, Mother thereafter participated in services (including a domestic violence program and conjoint counseling) that were ordered to ameliorate the problems. So far as the record reveals, there were no additional domestic violence problems between the two thereafter—even with the continued interaction between them that was one source of the concern from the juvenile court and minor's counsel.

Third, the cited concern about interaction with a more problematic partner was present and rejected in *M.G.*, a dependency case that similarly arose as a result of domestic violence between the mother and her boyfriend (as well as the children's father). (*M.G.*, *supra*, 46 Cal.App.5th at 650.) In *M.G.*, the mother continued to have a relationship with the boyfriend even after the filing of the dependency petition and there was at least one instance when he was present at a visit in violation of a court order. (*Id.* at 652, 654-655.) As here, however, the mother's therapist opined the mother did not pose a risk to the children's safety and the Court of Appeal reversed the detriment finding notwithstanding the juvenile court's stated concern about the mother's continued relationship with her boyfriend. (*Id.* at 658, 662.)

All that remains of the juvenile court's justification for its order is likewise unpersuasive. The court relied on Mother's

15

early domestic violence program providers' view that she had difficulty understanding the concepts being taught, but this does not account for Mother's *more recent and successful completion* of a domestic violence course. The court stated it had "underlying mental health concerns" about Mother, but these were not shared by her therapist or treating psychiatrist, nor were they significantly borne out in the psychological evaluation the court ordered Mother to undergo. Finally, the court expressed concern about Mother's reluctance to follow the diet recommended for E.C. when she had the stomach flu. We agree Mother would have done better to follow the medically recommended diet, but we do not agree that Mother's disagreement about what to feed a child with a stomach ailment is sufficient to justify setting a hearing to order adoption (or guardianship) of the child.

## DISPOSITION

The petition for extraordinary writ is granted. Let a peremptory writ of mandate issue directing the juvenile court to vacate its order setting a hearing under section 366.26 and to hold another final review hearing as soon as possible, consistent with the right of all sides to prepare their case. If, at the new final review hearing, there are no new developments (i.e., facts that did not exist at the time of the juvenile court's order under review) that warrant otherwise, E.C. should be returned Mother's physical custody with any necessary conditions; that is because, absent such developments, there is insufficient support for a detriment finding. If the court does find new developments warrant a different conclusion, the court shall explain the developments on the record in a manner sufficient to permit appellate review of that conclusion and make any necessary orders.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.

17