Filed 10/16/24  In re Isabella M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re ISABELLA M., a Person Coming Under the Juvenile Court Law. | B330514<br>(Los Angeles County Super. Ct. No. 22CCJP00327) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>AMANDA K.,<br><br>　　　Defendant and Appellant. | |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Lucia J. Murillo, Juvenile Court Referee. Affirmed

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Amanda K. (mother) appeals from an order terminating her reunification services with her child Isabella M. at a 12-month status review hearing pursuant to Welfare and Institutions Code section 366.21.[1]  As substantial evidence supports the juvenile court's order, we affirm.

## COMBINED FACTUAL AND PROCEDURAL HISTORY

Mother has two children, Isabella M. (born April 2014) and her half sibling Jason N., Jr. (born November 2020).[2]  Jason N., Jr.'s father is Jason N. (father).  Isabella's father, Charlie M., is not a party to this appeal.

**Referral and initial investigation**

On January 23, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a call alleging Isabella and Jason were in an unsafe situation, living in a tent in a homeless encampment on a median on a busy street in Venice,

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Jason is not a subject of this appeal and will be mentioned only as necessary.

2

California.  A service provider tried to arrange services for mother and the children.  Mother refused assistance, including food and motel vouchers, and reacted aggressively towards the outreach provider, causing the service worker concern about the children, who appeared dirty and malnourished.  Mother was observed to have left the children outside the tent, unsupervised.  Two other people in the camp reported mother left the two children unattended "all the time."

In a second call to the DCFS hotline, the caller provided more information, including that mother and the children were from New York and recently arrived in California.  Mother claimed to have left New York because she was not getting along with maternal grandmother (MGM) and due to domestic violence with father.  Mother stated there was a protective order in place in New York.

A DCFS social worker made contact with mother at the encampment on January 23, 2022.  There were approximately 20 tents on a median with lanes of traffic on either side.  Mother insisted she was not homeless and that she had friends and family in the area, but could not provide any contact information.  Mother became agitated and belligerent when the accompanying Los Angeles Police Department officer pointed out that Isabella was barefoot in the cold weather.

Mother claimed to be having issues with father, including him being mentally abusive and a drug dealer.  She said there was a restraining order against him and an upcoming custody hearing in New York.  Mother admitted she had been diagnosed with "Bi-Polar Schizo affected" but provided varying answers to whether she was taking medication.  Mother admitted using marijuana but was unclear when she had last used the drug.

3

Jason was in a wet, dirty onesie without a diaper asleep in a stroller. His arms and legs were streaked with dirt and covered with sand. Isabella was also very dirty and unkempt and could not tell the social worker when she last had a bath. Isabella confirmed mother would leave her alone in the tent in charge of the baby. Isabella reported Jason's "daddy" was a bad man who used drugs.

Mother stated father raped her in New York. Though she was uncertain he was Jason's father, she was hesitant to ask for a paternity test as she believed father knew people who could manipulate the results of such a test. Mother reported father was a drug addict and dealer and was "organized gang stalking" her. Mother added there had been involvement with child protective services (CPS) in New York but did not provide specifics. Mother admitted having been addicted to oxycodone following a car accident in the past. She completed a 30-day rehabilitation program, following an eight-day hospitalization, and occasionally used marijuana and alcohol.

The officers transported mother and the children to the police station, expressing concern about the children being in the dangerous encampment. When mother was informed the children would be detained, she became angry and telephoned MGM, yelling that MGM had to come to California to get the kids.

The social worker spoke with MGM, who informed her that mother had been planning to relocate to California, and there was trouble with father, who had visitation. MGM confirmed mother had a history of mental health issues and was previously addicted to oxycodone, due to the fault of mother's doctors. MGM was uncertain if there was a CPS history in New York.

4

**Petition and detention**

On January 25, 2022, DCFS filed a section 300 petition on behalf of the children, containing allegations of mother's neglect, failure to supervise the children and mental health issues. A first amended section 300 petition was later filed, which added counts regarding father's substance abuse and mother's failure to protect the children.

In a last minute information for the court filed on January 28, 2022, DCFS reported a conversation between a local social worker and a Sullivan County New York CPS social worker, Jenesis Matos, on January 26, 2022. Matos reported the family had an open referral in New York but no court filing. There was a current family law proceeding pending, and father had monitored visitation with the children. Mother had a history of mental health issues, psychiatric hospitalizations, prescription drug abuse, and leaving the children unsupervised. Mother once told the authorities after leaving the children home alone that the pit bull dogs would guard them. Mother had previously lost custody of Isabella due to mental health issues and was not medication compliant. Mother had taken Isabella out of school without notice to the school, and when social worker Matos reached mother, mother told her they were on vacation in Los Angeles.

A second last minute information for the court filed on January 28, 2022, indicated father had contacted DCFS on January 25, 2022, and acknowledged having monitored visits twice per week. Father stated mother took the children out of New York without his permission. Mother had been leaving the children with him for days at a time despite her request for a restraining order. Father claimed mother's allegations in the

restraining order were untrue. He denied being part of a gang or dealing drugs. Father confirmed mother's mental illness, recent hospitalizations and prior loss of custody of Isabella.

Father reported mother had picked up the children from his home on January 8, 2022, and was screaming in the streets that father was a drug dealer. Afterwards, mother got in a serious car accident with the children in the car. Mother's driver's license was suspended because she did not have insurance. Mother then went to a friend's home and rented a U-Haul. Father believed mother then left for California. Father had been looking for the children for two weeks before calling DCFS.

At the January 28, 2022 hearing, the juvenile court acknowledged possible jurisdictional issues under the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) and indicated it would contact the court in New York. The court found a prima facie showing had been made and ordered the children detained in foster care. Mother's visits were to be monitored. The court ordered DCFS to assist mother with transportation, housing, and to provide no- or low-cost referrals for appropriate services.

**Additional reports**

An addendum report was submitted February 24, 2022. Social worker Matos reported father said mother would drop the children with him for days. Mother attended the same outpatient drug treatment center as father, but was terminated due to noncompliance. Matos said mother "is Bipolar and Schizoaffective and fails to take her medication and self-medicates." Matos believed mother had a "severe long psychotic breakdown" that caused mother to come to California. Matos

6

indicated mother "fails to address her issues and the [MGM] minimizes mother's issues." Mother had informed Matos she was not planning on returning to New York.

Father did not wish to have contact with mother. He wanted to have Jason and Isabella with him and the case to be in New York. Father described domestic violence on the part of mother, saying she smashed his windshield with a hammer when he was leaving and punched him in the mouth.

The March 15, 2022 jurisdiction/disposition report included additional interviews with mother and extended family. On February 1, 2022, the social worker met with mother; MGM, who had come from New York; and maternal great aunt, Lisa M. at the home of Lisa M. Mother stated she was living in a tent in Venice and at times would stay with Lisa M., who had a foreign exchange student living with her. Mother also claimed to have an 18-year-old sister living in the area with whom she could stay, as mother wanted to remain in California but needed a place to live. Mother was given contact information for St. Joseph's Center in Venice, which could assist mother, who was willing to attend therapy and gave the social worker permission to contact her New York therapist. Mother said she would follow up with St. Joseph's Center.

Lisa M. said the family did not know mother had been in Venice. They had paid for mother to stay at a hotel, but mother left without notice. The family did not know where mother was for days.

By February 10, 2022, mother had entered the Believe in Big Change (BIBC) program. The social worker coordinated with the BIBC program and the children's foster mother to ensure mother would have visits with the children.

The foster mother reported that on mother's February 20, 2022 visit with the children, they were happy to see mother and spent time playing and swimming. Mother, however, repetitively prayed over the children and asked the BIBC staff for scissors to cut Isabella's hair. Mother became upset when it was time to end the visit, requiring BIBC staff intervention and causing the children to cry. The foster mother is uncomfortable monitoring mother's future visits. The foster mother also conveyed Isabella's statements that mother got into a fight when they were residing in the tent.

Maternal aunt, Ashley H., who lived in New York, expressed concern about the children being placed with father and described the paternal family as unsafe. She sought to have the children placed with her. Ashley H. and mother had a close relationship until two years ago when mother "got sick." Mother called Ashley H. when she was in crisis.

In an interview with Jason's paternal aunt, Erin N., she recounted that mother would leave the children with father for stretches of time and other times would keep the children from him over custody issues. Jason's paternal grandmother expressed an interest in having the children placed with her. She confirmed father lived with her intermittently and claimed mother made false allegations against her.

A March 15, 2022 addendum report explained that mother attended the same treatment program as father in February 2021, which she had entered after she went to the hospital and was evaluated as having depression. Father was "harassing" and "abusive" towards her and made false allegations against her. Mother ended their relationship in July or December 2021 because it was toxic. Mother stated father yelled and behaved

8

irrationally. Prior to completing the treatment program, mother left for California.

Mother began receiving disability benefits in 2020 or 2021, though she does not know the reason she was receiving benefits. Mother was prescribed medications for her anxiety but was told she no longer needed the medications. Mother was also prescribed medication for her ADHD, medication to help her sleep, and Prozac. She is not currently taking the medications. Mother was told she did not qualify for mental health services, although she still suffered from anxiety. Mother believed she needed more time at BIBC and was willing to cooperate with services.

A March 24, 2022 last minute information for the court advised that on March 17, 2022, mother's visit with the children was canceled due to mother's behavior. By the next day, BIBC informed DCFS mother was terminated from the program. Mother had been acting strangely, making multiple calls to family members, not attending program classes, spending hours on the floor putting on makeup, and making calls to Charlie M. pretending to be a court officer and laughing. Mother had also been calling the social worker continually to say she wanted Ashley H. present at all her meetings. At a March 22, 2022 meeting with mother, father, and DCFS, mother said BIBC was making efforts to get her moved to Pacifica House through St. Joseph's Center.

A May 11, 2022 last minute information for the court indicated mother had left her third treatment program. Mother had gone from a program at Patterns, to an unnamed program on Van Ness, then to a motel in Orange County in just a few weeks. Visits had been set up while mother was in the Van Ness

program, but mother left before the first visit could take place. Lisa M. informed DCFS mother might be enrolled at the Alcoholism Center for Women, Inc. Miracle House residential program in Los Angeles. Given mother's moves, it was difficult to implement a visitation schedule with the children.

**Adjudication and disposition**

At the May 11, 2022 adjudication, the juvenile court informed the parties the New York court was declining jurisdiction. Father and mother appeared via Webex and were represented by counsel. Mother pled no contest. After hearing argument, the juvenile court sustained the amended petition.

In a May 25, 2022 last minute information for the court, DCFS reported mother had gone to the emergency room on April 29, 2022, saying she was unable to eat or sleep and was homeless. She expressed feeling "very down" and asked for a psychological evaluation. Mother was diagnosed with bipolar disorder, placed on hold, and discharged on May 4, 2022. Mother entered a program called Jump Street, but left the program and enrolled at Pacifica House on May 13, 2022. Pacifica House was a 60- to 90-day program, which did not allow visits.

The disposition was heard on May 25, 2022. The court declared Isabella a dependent of the court, removed her from mother, and ordered her suitably placed. The court ordered reunification services for mother, including a substance abuse rehabilitation program with weekly drug testing, a 12-step program, mental health counseling including a psychological assessment, and individual counseling to address domestic violence, substance abuse, and parenting.

10

**Progress reports**

At the August 24, 2022 progress hearing, mother submitted a letter from Fred Brown Recovery Services reflecting her admission into their outpatient drug and alcohol treatment program on July 22, 2022, and her consistent attendance in individual counseling and group sessions. She was receiving psychiatric care, was medication compliant, and she had a sponsor while working on a 12-step program. The children had been placed with Lisa M. in Orange County.

By the November 21, 2022 section 366.21, subdivision (e) progress hearing, mother was compliant with the case plan. She was residing in Recovery Bridge Housing Sober Living Program and looking for permanent housing. She was on a waitlist at Miriam's House, which provided housing for one year to women with children. She was also on a waitlist for "Section 8" housing. Mother had obtained a job and a car. She was enrolled in mental health services at Behavioral Health Services. Mother was visiting the children three times a week, and her visits had been liberalized to unmonitored. Mother wanted to live with Lisa M. and the children if the children were returned to her. Lisa M. said mother could live with her while she looked for her own residence.

On November 29, 2022, mother submitted a letter from Long Beach Rescue Mission saying mother had enrolled in their New Life Recovery Program on November 10, 2022. DCFS expressed concern that mother "does not consistently manage mental health symptoms," which places the children in danger. DCFS wanted mother to continue reunification services so she could show "consistency over time in her management of her mental health." Because this was a new program, mother would

need to show progress and consistency, because mother had started new programs before "and then left when she did not want to abide by the rules."

At the November 29, 2022 section 366.21, subdivision (e) hearing, the juvenile court found mother's progress to be partial and continued reunification services. The court ordered mother to drug test every other week and permitted overnight visits with the children.

In the January 24, 2023 interim review report, DCFS reported mother was compliant with the case plan and was living at the Long Beach Rescue Mission. She visited the children three times a week, with one overnight visit per week. There was concern, however, that mother was minimizing her mental health issues. Mother told the social worker she did not think she had mental health problems and instead had made a poor decision to stay at the Venice encampment with the children. Mother's counselor at Long Beach Rescue Mission also expressed concern mother was minimizing her mental health and substance abuse needs.

**Mother's section 388 petition**

Mother filed a section 388 petition on February 15, 2023, asking that Isabella be released to her and attaching numerous letters from her recent providers. Mother's address was listed as Miriam's House.

On February 23, 2023, DCFS provided last minute information for the court including mother's statement she was not minimizing her mental health needs. Mother stated she never had any mental health concerns prior to dating father and believes her mental health symptoms were drug induced. Mother missed a child and family team meeting scheduled for

February 9, 2023, because she had to go to urgent care.  She was also unreachable by the child guidance center intake coordinator, who had been trying to contact mother regarding enrollment papers.  On February 28, 2023, the juvenile court denied mother's section 388 petition after a hearing, finding she was in partial compliance with her case plan, and it was then not in Isabella's best interest to grant mother's petition.

**Status review report**

DCFS submitted a status review report for the May 30, 2023 section 366.21, subdivision (f) hearing.  Mother had been residing at Lidia House, but left without informing DCFS.  The social worker telephoned Lidia House to find out why mother left and was informed mother had been asked to do a few things by the program that she did not do.  Lidia House could not provide any further information without mother's consent.  Maternal great aunt and uncle said mother was terminated from the program because they required mother to detox from Suboxone and mother had not completely done so.

Mother was residing at Miriam House, a residential program for women with mental illnesses and/or drug addiction.  Mother enrolled in the program on February 24, 2023.  However, on May 4, 2023, the program director informed DCFS mother had been terminated from the program for noncompliance.  Mother left the house on May 3, 2023, at night and did not return.  The director called mother on May 4, 2023, and mother said she got gas to go to the doctor.  Mother had not responded to the social worker's requests for her current residence at the time of the preparation of the report.

On March 2, 2023, mother attended a dental appointment with Isabella and one of Isabella's caregivers to sign consent

forms. Isabella needed anesthesia to complete the procedure. Prior to the procedure, when mother was alone with Isabella, mother gave Isabella a candy bar to eat so the procedure could not proceed. Mother refused to schedule another appointment and stated she would not sign consent forms until the children were in her car and she could drive them. On the way home from the dentist, Isabella informed maternal great aunt that mother had told her to say father uses drugs.

The caregiver also reported mother often canceled visits and the children were very dirty and hungry when they returned from seeing mother. They often ate only candy. Mother did not visit during the 10 days between when she left Lidia House and went back to Miriam House. When she visited at the caregivers' home, mother refused to help put Jason to bed. During overnight visits, if Jason cried, mother would call the caregivers to come and get him. Often she would end overnight visits early.

On March 21, 2023, when the caregivers came to pick up the children from their overnight visit with mother, they found Isabella alone in the lobby crying because she did not know where to find mother, who was outside in the rain with Jason, who was wearing only a diaper and a shirt. The caregivers reported Jason did not sleep through the night after overnight visits with mother. Isabella suggested it was probably because mother took Jason outside in the middle of the night to play, as mother told Isabella when Jason would not wake up in the mornings.

The social worker met with mother at Miriam House on March 13, 2023. Mother said she stopped taking Suboxone. She continued to attend 12-step meetings and see her psychiatrist

14

and therapist. Mother said she gave Isabella the candy bar because she did not want the dental procedure.

At the time of the writing of the status report, mother's whereabouts were unknown. Mother left her housing program. The caregivers reported mother had come to their home in the middle of the night asking for money and said she was contemplating driving to New York to check into a hospital. By May 14, 2023, the maternal great aunt and uncle notified DCFS the children had to be relocated by June 1, 2023, due to mother's behavior. The previous night, mother had come to their home with police, who said they found mother at a gas station, without a driver's license, and asked the maternal great aunt and uncle if they could move the car so it did not get towed. Maternal great uncle drove the car to a motel and then told mother, with the police present, not to sleep in the car in front of their home, as she had previously done. Mother accused maternal great uncle of sexually abusing his adult daughter, although the adult daughter denied any such behavior. Mother told police she wanted maternal great uncle arrested for threatening her. Mother said she was permitted to visit the children whenever she wished. Maternal great aunt and uncle told the social worker they loved the children, but mother's behavior threatened them, and they were considering a restraining order.

**Section 366.21, subdivision (f) reports and hearings**

Ashley H.'s New York home was approved, and DCFS sought court authorization to move Isabella there. Mother was also considering moving to New York. DCFS recommended that reunification services for mother be terminated.

On May 30, 2023, the juvenile court heard argument from counsel at the section 366.21, subdivision (f) hearing. Counsel for

Isabella submitted on DCFS's recommendation that reunification services for mother be terminated. Mother objected. The court ordered Isabella transported to Ashley H.'s home in New York and changed mother's visits back to monitored, over mother's objection.

At the continued hearing on June 29, 2023, DCFS reported that on June 4, 2023, Isabella was placed with Ashley H. in New York. Mother told the social worker she was hospitalized and considering moving to New York to be closer to Isabella and Jason.

Mother's counsel again objected to the recommendation mother's reunification services be terminated, arguing mother had made substantial progress in her case plan and had been consistently visiting. Counsel for Isabella submitted to DCFS's recommendation. The juvenile court found mother's progress towards alleviating or mitigating the causes necessitating placement of the child had been minimal. Mother's reunification services were terminated because the court found by clear and convincing evidence DCFS offered or provided reasonable services and there was no substantial probability the child would be returned to the custody of mother by the 18-month date.[3] A section 366.22 hearing was set for August 2023.

On July 3, 2023, mother filed a notice of appeal from the court's June 29, 2023 order terminating her family reunification services.

---

[3] Mother, who appeared remotely and had been interrupting throughout the proceedings, was muted by the court and told to speak with her attorney.

16

**DISCUSSION**

Mother argues the juvenile court erred in denying her additional reunification services because there was a substantial probability Isabella could be returned to her within the 18-month review period.

## I.    Applicable law and standard of review

At the 12-month review hearing pursuant to section 366.21, subdivision (f)(1), the juvenile court "shall order the return of the child to the physical custody of [his or her] parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to [his or her] parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

The juvenile court may extend reunification services "up to a maximum time period not to exceed 18 months after the date the child was originally removed from the physical custody of [the child's] parent" if it finds that there is a substantial probability the child can be returned to parental custody within the extended time period or that reasonable services have not been provided to the parent.  (§ 361.5, subd. (a)(3)(A); see § 366.21, subd. (g).)

We review the juvenile court's order terminating reunification services for substantial evidence.  (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1016.)  Under this standard, we determine "whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)  All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the court's decision, if possible.  (*Ibid.*)  Where there is more than one inference that can be reasonably deduced from the

17

facts, we are without power to substitute our deductions for those of the trier of fact.  (*Ibid.*)

II.   **Substantial evidence supports the juvenile court's order**

Substantial evidence supports the juvenile court's determination that there was no substantial probability the child would be returned to mother's custody within the 18-month time frame.  The child was initially detained in January 2022, and mother was provided reunification services through June 2023.  Mother had a long history of drug and mental health problems and had made little progress in addressing such problems during the pendency of this proceeding.

Mother had been involved with child protective services in New York prior to coming to California and had received diagnoses of mental health issues but was not compliant with medications.  She had a history of leaving her children unattended.  While she started outpatient drug treatment in New York, she was terminated due to noncompliance.

Mother enrolled in various programs during these proceedings, but did not successfully complete any program nor was she able to show progress and consistency.  Between the January 2022 detention and May 2022 disposition hearings, mother had enrolled in and either left or was terminated from the following programs: BIBC; Patterns; a program on Van Ness; Alcoholism Center for Women, Inc. Miracle House residential program; Jump Street; and Pacifica House.  Between the time of the May 2022 disposition and the June 2023 hearing at which reunification services were terminated, mother had enrolled in and either left or was terminated from the following programs: Fred Brown Recovery Services, Recovery Bridge Housing Sober

Living Program, New Life Recovery Program at Long Beach Rescue Mission, Lidia House, and Miriam House. In total, mother was confirmed to have enrolled in at least nine programs during the proceedings and had completed none.

Despite receiving mental health services, mother minimized her mental health issues and told the social worker she believed her mental health issues were drug-induced. Mother's counselor at Long Beach Rescue Mission also expressed concern that mother minimized her mental health issues. Mother behaved erratically towards the maternal great aunt and uncle while they were providing care for the children. She slept in front of their home, accused the maternal great uncle of sexually abusing his adult daughter, and told police she wanted him arrested. The children had to be removed from the maternal great aunt and uncle's home due to mother's behavior.

Mother's behavior was detrimental to the well-being of the children. Mother gave candy to Isabella prior to a dental appointment so that the dental procedure could not proceed. She refused to schedule another appointment and stated she would not sign consent forms until the children were in her car and she could drive them. There was also evidence mother told Isabella to say negative things about her father. When mother's visits with the children were liberalized to overnight, mother returned the children dirty and hungry, called maternal great aunt to pick up the children early, took Jason out to play in the middle of the night, and left Isabella alone and unsupervised while outside with Jason. Among other things, mother's long history of leaving the children unsupervised began in New York, continued while she was residing with the children in a tent on a busy median, and remained a concern at the time of the section 366.21,

19

subdivision (f) hearing.  Thus, there was substantial evidence that mother had not progressed in resolving the issues that brought the children before the court.

The evidence summarized above supported the juvenile court's determination that it was unlikely Isabella would be returned to mother within the 18-month time period described in section 361.5, subdivision (a)(3)(A).  Isabella was removed from mother's custody in January 2022.  By the time of the section 366.21, subdivision (f) hearing in June 2023, mother had been allowed approximately 16 months of services to show progress towards Isabella's safe return to her.  The juvenile court did not err in finding mother's progress had not been sufficient and there was not a probability that Isabella would be returned to mother's care within the allotted time frame.

Mother cites *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789, for the proposition that parents in the dependency system should not be expected to be "ideal."  The *David B.* court continued, "If we are lucky, they are parents who can learn to overcome the problems which landed their children in the system, and who can demonstrate the dedication and ability to provide for their children's needs in an appropriate manner.  They will not turn into superstars, and they will not win the lottery and move into a beachfront condo two blocks from a perfect school."  (*Ibid*.)  The juvenile court in this matter did not hold mother to an idealistic standard.  Instead, the court was focused on the "essential question" of Isabella's "safety, protection, physical or emotional well-being."  (*Id*. at p. 790.)  Substantial evidence supported the juvenile court's determination that mother had not demonstrated she would be

able to provide Isabella with these essentials within the statutory time frame.

**DISPOSITION**

The judgment is affirmed.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.